THE U. S. EX REL. YOUNG, petitioner in habeas corpus, *v.* IMODA.

HABEAS CORPUS — *Power of agents over Indian children.* — A writ of *habeas corpus* will not lie in favor of an Indian agent to recover the custody of Indian children taken from an agency school by a Catholic priest, it not appearing to have been done against the consent of the parents of such children.    Neither by treaty or statute have the Indians surrendered to the United States the right to compel their children to attend school, nor has the United States assumed to possess or exercise such right.    If the Indians fail in their treaty engagements in this respect, neither treaty or statute provide a penalty, nor does the right of compulsion pass to the United States or its agents.    It must be exercised by the parents of such children or the tribe to which they belong.

THIS is an application made to the supreme court of the territory of Montana, by John Young, agent of the Blackfeet Indians, against the defendant, C. Imoda, a Roman Catholic priest, to compel the return of two Indian children, alleged to have been taken away from the agency school against the wishes and without the consent of the agent.

JAMES L. DRYDEN, United States District Attorney, for petitioner.

The petitioner invokes the aid of this court in the release and return to the reservation, and the educational privileges provided by petitioner, of the two Indian children, Ah-Ween and So-Ween-a-Muck.

I. Petitioner's right to relief sought.

(*a*) Articles of Confederation, art. 9.

(*b*) Constitution U. S. sec. 8, art. 7, clause 3.

(*c*) Under above grants United States assumed control of Indian affairs, by ordinance of August, 1786, regulation of affairs turned over to war department, continued there by act of August, 1789, where it continued until present arrangement of act of 1869.

(*d*) Means and appropriations for the education of the Indians, made in 1819 (3 Stat. at Large, 516), and same provision continued under various acts and treaties, on down to the present. Sec. 2071, Rev. Stat. 1878.

(*e*) Under treaty of April, 1868, art. 7 (Revision of Treaties, page 918), means of education guarantied children of Blackfeet, their attendance upon school stipulated for, and the agent specially authorized to enforce these stipulations.

(*f*) What is the limit of the control of government over Indian affairs? Practically unlimited, under statutes and treaties. Government locates and removes them at pleasure; forbids hunting, fishing, trading, etc.; forbids all surveys, settlement or encroachment upon reservations; forbids introduction and sale of spirituous liquors; regulates their sanitary and sumptuary condition; protects, maintains and provides for them, and in short exercises all the functions of guardian.

(*g*) Upon what principles, or by what authority, is this right of control established?

1st. The peculiar relationship between the two justifies the one in assuming control over the other. The tribes are neither independent states nor foreign nations, but were unsettled domestic dependencies. *Cherokee Nation v. State of Georgia*, 9 Curtis, 178–235; *Worcester v. State of Georgia*, 10 Curtis, 214–274. The states and all individuals are prohibited from interfering with control of government over them. *Cherokee Nation* and *Worcester v. Georgia, supra.*

Their title to soil only that of occupation and posses-

sion, and interference by state, foreign power or individual looked upon as invasion of rights of government.

2d. Authority derived from consent of tribes themselves. All treaties, stipulations, grants, executions, orders and acts of congress, to and with the tribes, are based upon their consent, express or implied. Applied particularly to treaty of 1868, now in force, and quoted in petition.

(*h*) Applied to case at bar.

1st. From the express terms by which government is empowered by the charters to manage *all the affairs of the tribes.*

2d. From the long continued and undisputed exercise of the right.

3d. From the acquiescence of state and territorial governments.

4th. From the peculiar relations of the parties.

5th. From the consent of the Indians themselves.

6th. From the terms of existing contracts, guaranteeing protection and support on part of the government, and obedience and efforts toward development on the part of the tribes.   We contend:

(1) That the government of the United States is, and of right ought to be, charged with the sole and exclusive management and direction of the educational, as well as other, interests of the Indians.

(2) That the peculiar relationship and dependence of the one upon the other not only justify, but constitute the government the proper and natural guardian of the tribes, and that only when they lose their distinctive peculiarities by merging, either as tribes or as individuals, into citizenship, do these people become emancipated from this exclusive control and guardianship of the general government.

(*i*) Force and effect of treaties.

Under the authority of the charters of government, congress has right to declare the general government the

legal guardian of the Indian tribes. Precisely the same thing, in effect, is done by treaty of 1868; and as to the force and effect of treaties see opinion of court. *U. S.* v. *Schooner Peggy*, 1 Cranch, 37; *Foster & Elons* v. *Neilson*, 2 Pet. 253; Att'y Gen'l Cushing, Opinions of Att'y Gen'l, 6, p. 291; Opinions of Att'y Gen'l, 13, pp. 354, 359; id. vol. 15, p. 632; *Worcester* v. *Georgia, supra.*

II. Of *habeas corpus.*

(*a*) Is also of charter origin. Art. I, sec. 9, clause 2, Constitution of United States; Ordinance of July 13, 1787, art. II, Government of Northwest Territory; Codified Laws Montana (1871 and 2), p. 487.

(*b*) A writ of right. Kent. Com. vol. 1, p. 640.

(*c*) A common law right. *Sims' Case,* 7 Cush. 285; *Passmore Williamson,* 26 Penn. 1.

(*d*) Also express constitutional right at all times except invasion, etc. Constitution and Ordinance 1787, *supra.*

(*e*) Not limited to "criminal or supposed criminal matters," but writ of right, which subject is entitled to *ex debito justitiæ.* Bac. Abr. Habeas Corpus, "A;" Kent. Com. vol. 1, p. 642; *Cable* v. *Cooper,* 15 Johns. (N. Y.) 154; *Case of J. and N. Yates,* 4 Johns. (N. Y.) 322.

(*f*) Person restrained entitled to apply for himself. 14 Howard State Trials, 814; Hurd on Habeas Corpus, p. 211.

(*g*) No legal relation between party restrained and party making application required. May be made by any one. *State* v. *Philpot,* Dudley, Geo. Rep. 42.

(*h*) Mere volunteers will not be listened to. What the court will consider. Hurd on Habeas Corpus, p. 213.

(*i*) What is restraint (?). Kent. Com. vol. 1, p. 631; *Homer* v. *Battyn,* Buller, Nisi Prius, 62; *Pike* v. *Hanson,* 9 N. H. 401; *Com.* v. *Ridgway,* 2 Ashmead (Pa.), 247; Hurd on Habeas Corpus, p. 210.

III. Jurisdiction.

(*a*) Act May 26, 1864, providing temporary government for Montana territory, chap. 95, sec. 9 (13 Stat. 88, 89), provides for appeal to supreme court of United States

from decisions of supreme court and district courts of territory on questions of *habeas corpus*, by implication. Court has jurisdiction.

(*b*) This is a court of the United States. Jurisdiction in this class of cases is not exclusive in circuit or district courts. If court has jurisdiction of subject matter and parties, then it has jurisdiction of case, not only as a court of United States, but by common law jurisdiction, under section 1868, Rev. Stat. 1878. See Codified Laws Mont. 1871–2, p. 487, §§ 1, 2, 3, 4.

WADE, C. J.    This is an application for a writ of *habeas corpus.* The petition in substance states that the petitioner is the agent of the United States for the tribe of Indians known as the Blackfeet Indians, dwelling within the territory of Montana; that under and by virtue of certain treaties between the United States and said tribes, and the acts of congress pertaining thereto, the United States has established a school at the Blackfoot agency for the education of the minor children of said tribe of Indians, and that such agent, by virtue of said laws and treaties, is given the right, on behalf of the United States, to the custody, care, training and education of said minor children.

The petition further states that one C. Imoda, a priest of the Roman Catholic church of the St. Peter's mission, on the 23d day of May, 1880, came upon the Blackfoot reservation, and did unlawfully seduce, entice and abduct from the said school and from the reservation, and did carry and lead away with him beyond the limits of the reservation, and without their consent or that of the United States, two Indian boys, to wit, Ah-Ween, aged twelve years, and So-Ween-a-Much, aged nine years, whose parents are members of the said Blackfoot tribe, and refuses on demand to surrender said children to said agent of the United States. Wherefore the petition for a writ of *habeas corpus.*

The relations existing between the United States and

the Indian tribes are regulated by treaty stipulation. It is not necessary to inquire by what right or authority these tribes and the United States treat and contract with each other. It was argued at the bar that the relation existing between the Indians and the United States was substantially that of guardian and ward, and hence that the United States, as guardian, had the right to the custody and care of its wards, the children aforesaid. What difficulties might arise in attempting to explain how the general government, as guardian, has the right to treat and contract with its wards, we shall not undertake to point out. It is sufficient to know that the government does treat with the Indians. For the purposes of this case, we must consider the Indian tribes as distinct communities, capable of entering into and forming treaties with the United States.

It has ever been the policy of the government, while asserting final sovereignty and dominion over the soil within its jurisdiction, to respect the possessory or other rights of the various Indian tribes. Such rights have been enlarged or extinguished by treaty. The government recognizes the authority of the Indian tribes to make treaties. It does not assert any authority over the Indians except such as is founded upon their consent. The government has attempted to civilize the Indians and to give to their children the rudiments of an education, but whatever has been done in this regard has been performed by virtue of treaty stipulation.

The rights of the petitioner, then, must depend upon the provisions of the treaty existing between the United States and the Blackfoot tribe, and the laws of congress made in aid of and not in conflict therewith.

Article 7 of the treaty is as follows: "In order to insure the civilization of the Indians entering into the treaty, the necessity of education is admitted, especially of such of them as are or may be settled on said agricultural reservations, and they therefore pledge themselves

to compel their children, male and female, between the ages of six and sixteen years, to attend school; and it is hereby made the duty of the agent of said Indians to see that this stipulation is strictly complied with; and the United States agrees that for every thirty children between said ages who can be induced or compelled to attend school, a house shall be provided, and a teacher competent to teach the elementary branches of an English education shall be furnished, who will reside among said Indians and faithfully discharge his or her duties as a teacher." Revision of Indian Treaties, p. 918.

As early as 1819, and long prior to the taking effect of the treaty aforesaid, congress, with a view to the education and civilization of the Indians, had enacted the following statute, which is still in force: "The president may in every case, where he shall judge improvement in the habits and condition of such Indians practicable, and that the means of instruction can be introduced with their own consent, employ capable persons of good moral character to instruct them in the mode of agriculture suited to their situation; and for teaching their children in reading, writing and arithmetic, and performing such other duties as may be enjoined according to such instructions and rules as the president may give and prescribe for the regulation of their conduct in the discharge of their duties. A report of the proceedings adopted in the execution of this provision shall be annually laid before congress." Revised Statutes of the U. S., sec. 2071, p. 865.

Upon this statute and treaty the relator rests his right to the writ prayed for in his petition. And the question presented is, whether the Blackfeet Indians, by having entered into this treaty obligation, thereby surrendered to the United States or to its agents the right to the possession, custody, care and education of their minor children.

This treaty and statute fairly illustrates the policy of

the government towards the Indians. The purpose is to civilize and educate them. But the government does not assume to force upon the Indians an education, nor to compel them to adopt the modes of civilized life. The fundamental idea is that whatever is done in the premises must be by consent of the Indians. The treaty is based entirely upon that proposition. It admits the necessity of an education for the purpose of civilizing the Indians. It provides for a school house and a competent teacher at the agency. And the Indians on their part contract and promise to compel their children, male and female, between the ages of six and sixteen, to attend school, and it is made the duty of the agent to see that this stipulation is carried out.

By the terms of the treaty the Indians are to compel their children to attend school. But the United States is given no authority over the children; certainly is not given the right to their custody and possession. The agent of the United States is only charged with the duty of seeing to it that the Indians redeem their pledge and send their children to school. But suppose they do not? Suppose they violate their pledge and fail to perform their contract? Is such failure accompanied by a penalty giving to the United States the right to the possession and custody of the children of the tribe? We think not. The United States cannot compel these Indian children to attend the school. Such attendance can only be enforced by their parents or the Indians of the tribe.

If this were an application by the parents to recover the custody and possession of their children, a very different case would be presented. It does not appear that these children were taken by the priest against the consent of their parents; and if with their consent, and they have thus failed to perform the pledge and contract of the treaty, we do not think that the United States, thereby, becomes entitled to the custody of their children.

The application for the writ of *habeas corpus* is therefore denied.                          *Application denied.*