STATE EX REL. JACOBSON, RELATOR, *v*. BOARD OF COUNTY COMMISSIONERS, RESPONDENT.

(No. 3,339.)

(Submitted June 9, 1913.   Decided June 19, 1913.)

[134 Pac. 291.]

*New Counties—County Commissioners—Jurisdiction—Powers—*
*Statutes—Amendments—Effect on Pending Proceedings—*
*Certiorari.*

New Counties—County Commissioners—Excess of Jurisdiction—*Certiorari.*
1, 2.  *Certiorari* lies to review the actions of boards of county commissioners taken with reference to the creation of new counties, they being required, in such proceedings, to act as *quasi*-judicial tribunals within the meaning of section 7203, Revised Codes, which provides that the writ may go when a board exercising judicial functions has exceeded its jurisdiction and there is no appeal or any plain, speedy and adeqate remedy.

Same—Exclusion and Inclusion of Territory—County Commissioners—Limit of Power.
3, 4.  Chapter 112, Laws of 1911, did not, and Chapter 133, Laws of 1913, amendatory of the former Act, does not empower a board of county commissioners to incorporate territory within the boundaries of a proposed new county which is not included in the petition praying for its creation, or to exclude territory unless a proper petition for withdrawal thereof is presented.

Amendatory Statutes—Effect on Pending Proceedings.
5.  If an amendatory Act changes the very basis of a right or affects the jurisdiction, and provision is not made for a saving clause, proceedings initiated under the old law may not be completed under the new.

New Counties—Statutes—Effect of Amendments on Pending Proceedings—Case at Bar.
6.  Proceedings for the creation of a new county were instituted under Chapter 112, Laws of 1911, and petitions containing the necessary recitals presented to the proper board of county commissioners. One of the essentials to favorable action by the board under Chapter 112 was that the county proposed to be created had property of the assessed valuation of $4,000,000.  Proclamation calling for an election was not made until after Chapter 112 had been amended by Laws of 1913 (Chapter 133, p. 484).  Chapter 133 amended the original Act (Chapter 112) by authorizing the creation of a new county if it possessed assessable property to the amount of $3,000,000—thus changing the very basis of the proceedings and the jurisdiction of the board.  *Held,* on *certiorari,* under the rule declared in paragraph 5 above, that in assuming to complete the proceedings under the Act of 1913, the board's action was without jurisdiction and void.

Original application for writ of *certiorari* to review the actions of the board of county commissioners of Teton county looking to the creation of Toole county.   Writ issued.

*Messrs. Norris & Hurd,* and *Mr. John W. Coburn,* for Relator; *Mr. Edwin L. Norris* and *Mr. George E. Hurd* argued the cause orally.

*Messrs. Walsh, Nolan & Scallon,* for Respondent, submitted a brief; *Mr. C. B. Nolan* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

*Certiorari* to review the action of the board of county commissioners of Teton county. This proceeding was instituted by Henry Jacobson, a taxpayer and qualified elector within that portion of Teton county which was sought to be organized into a new county to be known as Toole county. On May 22, 1912, certain residents of the western portion of Hill county and the northern portion of Teton county presented to the county commissioners of Teton county petitions, in due form and subscribed by the requisite number of qualified electors, praying for the creation of a new county to be called Toole county, to comprise twenty-nine townships in the western portion of Hill county and substantially all of the northern half of Teton county, excepting about seven townships—the lines being drawn so as to exclude the town of Cut Bank from the proposed county. The petition recites that the assessed valuation of the property within the proposed new county is $4,122,357. Notice was thereupon given for a hearing for June 21. Adjournments were taken from day to day to July 5, on which last-named date a final hearing was had; twelve requests for withdrawals were denied, the prayer of the petitions granted, the proper resolution adopted, and the board determined the boundaries of the proposed new county as described in the petitions; that the petitions contained the requisite number of genuine signatures; that no lines of the proposed new county would pass within eighteen miles of the county seat of Hill county or the county seat of Teton county; that within the boundaries of the proposed new county was property of the assessed valuation of more than four million dollars as shown by the last as-

sessment; that the formation of the proposed new county
would not reduce the assessed valuation of either Hill county
or Teton county to less than five million dollars or the area
of either to an amount less than 800 square miles of surveyed
lands; that the proposed new county should be a county of
the seventh class and its name should be Toole. The board
thereupon adjourned to July 15, on which date the proposed
new county was divided into suitable road districts, school
districts and election precincts; the proper election officers were
appointed; an election called for October 15, 1912, and due
proclamation thereof made and published. In this proclama-
tion the territory in which the election was to be held was
described the same as in the original petitions and in the reso-
lution adopted on July 5. The board thereupon adjourned
*sine die.* On March 26, 1913, the board being in session, an
attorney representing certain petitioners moved the board ''to
take up the petition for the creation of Toole county and to
proceed to finally determine the same.'' At the same time there
was presented, considered and allowed ''a pretended petition
for the withdrawal of territory from the proposed Toole
county.'' On that day the board adopted a resolution grant-
ing the prayer of the petitions filed May 22, 1912, for the cre-
ation of the proposed new county to be known as Toole county;
defined its boundaries; determined that the petitions contained
the necessary number of genuine signatures; that no lines
of the proposed new county would pass within eighteen miles
of the county seat of Hill county or the county seat of Teton
county; that the territory sought to be included within the
new county contained property, according to the last assess-
ment, of at least *three million dollars;* that the formation of
the new county would not reduce the assessed valuation of
property in either Teton county or Hill county to a sum less
than five million dollars or the area of either of those counties
to an amount less than 800 square miles of surveyed land; that
the proposed new county would be a county of the seventh
class and be known as Toole county. The board further divided
the proposed new county into road districts, school districts

and election precincts; appointed election officers and entered an order "that the election for the purpose of creating said county and organizing the same as required by law be postponed until the 25th day of June, 1913." On March 27, a proclamation was issued calling an election for June 25, 1913, within the territory described in the resolution of the day previous, and publication thereof was ordered. On May 21 this proceeding was instituted. The petition sets forth the foregoing facts somewhat more in detail, and then alleges that an election was not held on October 15, 1912, as ordered; "that said pretended petition for withdrawal of territory from said proposed Toole county was not signed by any petitioners and in no respect conformed to or complied with the provisions of law relating to petitions for the withdrawal of territory from a proposed new county and no other withdrawal petitions, except those hereinbefore referred to and which were denied on or previous to July 5th, 1912, were presented to or considered by said board." It is further alleged that the resolution adopted on March 26, defining the boundaries of the proposed new county, included within the boundaries of such proposed new county territory for which no petition had ever been presented; that after the board had granted the withdrawal petition and had excluded from the proposed new county the territory described in such withdrawal petition, the assessed valuation of property within the proposed new county was then less than four million dollars and only slightly in excess of three million dollars. It is further alleged that all preparations are being made for holding the election on the 25th of June, and that, if such election be held, large expenditures will be incurred and the taxes of this relator increased thereby. A motion to quash the writ was interposed and the cause argued and submitted for final determination, it being agreed that the petition contains all the facts necessary to a complete determination of the questions sought to be raised.

1. Is the remedy by *certiorari* available? Section 7203, Re-
[1]   vised Codes, provides that the writ may be issued by the supreme court "when an inferior tribunal, board or officer,

exercising judicial functions, has exceeded the jurisdiction of such tribunal, board or officer, and there is no appeal, nor, in the judgment of the court, any plain, speedy and adequate remedy." It is urged upon us that the phrase "exercising judicial functions" gives character to the preceding words "tribunal, board or officer," and limits the exercise of this writ to a review of the acts of those tribunals which are clothed with judicial power by section 1, Article VIII of the Constitution, and the officers of such tribunals, or, in other words, that the writ runs only to courts or judges; but with this we do not agree. The common-law writ of *certiorari* issued to review the decisions of *quasi*-judicial bodies as well as those of courts. (1 Bailey on Habeas Corpus, Certiorari, *etc.*, sec. 171; 2 Spelling on Extraordinary Relief, sec. 1949; 6 Cyc. 751.) It has been the common practice to employ the writ to annul proceedings of such bodies as city councils, boards of county commissioners and the like, whenever such bodies exercised judicial functions and exceeded, or acted without, jurisdiction. So that, when our legislature employed the phrase "exercising judicial functions" above, it was intended to characterize the antecedent terms "tribunal, board or officer" and give to them a meaning which comprehends *quasi*-judicial bodies as well as courts and judicial officers strictly so called, just as they did comprehend such *quasi*-judicial bodies in the practice at the time the statute was first adopted. The question was determined by this court in harmony with these views, in *State ex rel. Buck* v. *Board of County Commrs.*, 21 Mont. 469, 54 Pac. 939, and we see no reason for changing our opinion.

Nothing that is said in *State ex rel. Arthurs* v. *Board of County Commrs.*, 44 Mont. 51, 118 Pac. 804, can be construed as conflicting with these views. In that case we assumed that the board of county commissioners was acting as a *quasi*-judicial body, but held that even so its refusal to take jurisdiction of a matter properly before it, or, after having acquired jurisdiction, its refusal to proceed, or its erroneous determination of a preliminary question of law upon which it refused to

examine the merits of the matter before it, would be corrected by *mandamus,* and further than that we did not go.

2. In proceedings for the organization of a new county, the [2] board of county commissioners is required to act as a *quasi*-judicial tribunal, within the meaning of that phrase as used in section 7203 above. Chapter 112, Laws of 1911, familiarly known as the Leighton Act, constitutes the board of county commissioners the tribunal which shall have control of the proceedings for the creation of a new county. Upon the filing of a petition the board "shall forthwith fix a date to hear the proof of the said petitions and of any opponents thereto." At the time so fixed, the board shall hear the petitioners and any opponents, and to that end "shall receive the proofs offered to establish or controvert the facts set forth in said petition or petitions," and from such hearing the board shall determine (1) the boundaries of the proposed new county; (2) whether the petition contains the genuine signatures of at least one-half of the qualified electors, *etc.;* (3) whether any line of the proposed new county passes within eighteen miles of the county seat of any county proposed to be divided; (4) whether the proposed county contains taxable property of the value of at least four million dollars; (5) whether the creation of the new county will reduce the assessed valuation of any existing county to an amount less than the minimum allowed by law; (6) whether the area of any existing county will be reduced to less than 800 square miles of surveyed land; and (7) the class to which the proposed county will belong and its name as stated in the petition. The facts required to be set forth in the petition are prescribed, and an affidavit is required that the signatures to the petition are genuine. It is very clear that every fact necessary to be set forth in the petition and affidavit is subject to be controverted by the opponents of the new county; and, if this be done in any given instance, the board must then receive evidence and render its determination thereon. While it is true that most of the facts required to be proved can be proved if they exist, by records which cannot be disputed, even so the board is required to consider the evidence, weigh the

same and deduce its determination therefrom.   But assume that the petition is attacked on the ground that certain signatures thereon necessary to make up the required number are not genuine—that they are forgeries or fictitious; certain it is then that in receiving conflicting evidence upon this question, weighing the same and determining therefrom the truth or falsity of the allegation that the signatures are genuine, the board is exercising some judgment and discretion sufficient to bring its actions within the definition of *quasi*-judicial functions, as given by this court in *Bair* v. *Struck*, 29 Mont. 45, 63 L. R. A. 481, 74 Pac. 69.

3. A valid petition describing the territory to be included [3] within the proposed new county is the very foundation of the proceedings for the creation of a new county under Chapter 112 of the Laws of 1911, or under the amendatory Act (Chapter 133, Laws of 1913). While under certain circumstances the board is authorized to exclude territory, there is not any authority in the board to incorporate new territory for which there has not been any petition presented. This proceeding is purely statutory, and for every act of the board, justification must be found written in the statute in express terms or necessarily implied; and since there is not any authority conferred upon the board to incorporate new territory, the order of March 26, 1913, including within the boundaries of the proposed new county territory not included in the descriptions given in the petitions filed for the creation of such county, was in excess of jurisdiction and void.

4. While authority is conferred upon the board to exclude territory "upon petition of not less than fifty per cent of the [4] qualified electors of any territory lying within said proposed new county and contiguous to the boundary line of the said proposed new county and of the old county from which such territory is proposed to be taken, and lying entirely within a single old county, and described in said petition, asking that said territory be not included within the proposed new county," the authority is limited to the circumstances just enumerated. Beyond the terms of the statute the authority does not exist.

In the present instance it is alleged in the petition that the board of county commissioners eliminated from the proposed new county a large amount of territory without any petition having been presented therefor, and this allegation is admitted. The withdrawal petition mentioned in the statute quoted above is indispensable to the existence of the right to exclude, and in the exclusion of territory without such petition as the law contemplates, the board in its order of March 26 exceeded its jurisdiction, and its act in that regard was void.

5. That the board of county commissioners did not have any jurisdiction to make the order granting the petition for the creation of Toole county on March 26, 1913, or to issue the proclamation of March 27, is apparent. At the time the peti- [5, 6] tions were filed (May 22, 1912), Chapter 112, Laws of 1911, was in full force and effect. At the time the order was made and the proclamation issued, that Chapter had been amended by an Act which was approved and which went into effect on March 21, 1913. (Laws 1913, p. 484.) Section 1 of the original Act contains four distinct prohibitions against the creation of a new county. Paraphrased, that portion of section 1 of Chapter 112 above, relating to this subject, would read as follows: ''A new county shall not be created (1) if its creation reduces the assessed valuation of any other county to less than five million dollars; or (2) if its creation reduces the area of any existing county to less than 800 square miles of surveyed land; or (3) if any line of the proposed new county passes within eighteen miles of the county seat of any old county proposed to be divided; or (4) if the new county has not property of the assessed valuation of four million dollars.'' As indicated above, the statute enjoins upon the board the duty to ascertain and determine that the proposed new county does not infringe upon any of these prohibitions, and if it does, the end of the proceeding for its creation is at hand. The board must find affirmatively ''that the proposed new county contains property of an assessed valuation of at least four million dollars.'' This is jurisdictional, and without this finding the board cannot proceed under Chapter 112 above. At the hearing

had on March 26, 1913, the board ascertained and determined that the proposed new county of Toole contains property of the value of at least $3,000,000. That this finding is not sufficient to warrant the board in proceeding further, and that all subsequent proceedings were and are void, must be conceded if the action of the board is to be controlled by Chapter 112 above.

But the board apparently assumed that its action was to be governed by the amendatory statute which had been approved and went into effect five days before the meeting of March 26 was held. The amendatory Act follows the original Act in enumerating the prohibitions 1, 2 and 3, but amends the original Act by substituting "three millions" for "four millions" as the minimum assessed valuation of the proposed new county. The board's determination is justified if the proceedings had been taken under the amendatory Act, but is not justified under the original Act. And this brings us to a consideration of the question: What was the effect upon the pending proceedings of the amendments to Chapter 112, there being no saving clause in the amendatory Act?

Section 119, Revised Codes, provides: "Where a section or a part of a statute is amended, it is not to be considered as having been repealed and re-enacted in the amended form, but the portions which are not altered are to be considered as having been the law from the time when they were enacted, and the new provisions are to be considered as having been enacted at the time of the amendment." This merely states a general rule as it was recognized by the authorities at the time our Codes were adopted. (Black on Interpretations of the Laws, sec. 133; 36 Cyc. 1083; *Ely* v. *Holton,* 15 N. Y. 595; *Moore* v. *Mausert,* 49 N. Y. 332.) In *City of Helena* v. *Rogan,* 27 Mont. 135, 69 Pac. 709, this court said: "Where a provision is amended by an Act using the words 'to read as follows,' it must be the intention of the lawmakers to make the amendment a substitute for the old provision, and to have it take its place exclusively." The same rule is stated in 1 Lewis' Sutherland on Statutory Construction, second edition, section 237, as follows:

"The amendment operates to repeal all of the section amended not embraced in the amended form. The portions of the amended sections which are merely copied without change are not to be considered as repealed and again enacted, but to have been the law all along; and the new parts or the changed portions are not to be taken to have been the law at any time prior to the passage of the amended Act." The effect which an amendment has upon pending proceedings is tersely stated by the supreme court of Indiana, in *Mayne* v. *Board of Commrs.,* 123 Ind. 132, 24 N. E. 80, as follows: "It may be conceded, when one or more sections of a statute are amended in the mode prescribed by the Constitution, that the amended sections cease to exist, and the sections as amended are, in effect, incorporated into the original Act; but when the new law is a substantial re-enactment of the old, merely changing modes of procedure, but not changing the tribunal or the basis of the right, and when it takes effect simultaneously with the' repeal of the old Act, it will be presumed, even without an express saving clause that the legislature intended that proceedings instituted under the old law should be carried to completion under the new." The converse of this proposition is equally true: If the amendment changes the very basis of the right or affects the jurisdiction, it cannot be that the legislature intended the proceeding to be completed under the new Act. From March 21, 1913, there was not any statute authorizing the creation of a new county with a minimum assessed valuation of property of four million dollars. The provision fixing that minimum limit was repealed by the new Act. Prior to that date there was not any statute authorizing the creation of a new county with an assessed valuation less than four millions. The provision for a new county based upon an assessed valuation of three millions as the minimum dates from the 21st day of March, 1913. It will be observed from a consideration of the original Act and the amendatory statute that the value of the assessable property has at all times been the very basis for the creation of a new county. While the statute authorizes withdrawals of territory from the proposed county as

its boundaries are prescribed in the petitions for its creation, yet the statute declares that whenever by such withdrawals the assessed valuation is reduced below the minimum, "then such new county shall not be created or organized." Again, each of the statutes specifically enjoins upon the board the duty to ascertain and declare affirmatively that the proposed new county contains property of the value equal to or exceeding the minimum provided by law. The change wrought by the amendatory statute affects the very basis of the proceedings and the jurisdiction of the board, and therefore the new Act cannot control proceedings pending at the time it went into effect.

Every elector who signed a petition for the creation of Toole county did so with the knowledge and understanding that whatever withdrawals of territory might be had, the remaining property within the new county must have a valuation of at least four million dollars, or the proceedings for its creation would fail. It would be absurd to say that the men who signed a petition under those circumstances consented to the creation of a new county with property of an assessed valuation of only three million dollars. The rate of taxation in a county having only three millions might be very much greater than in a county with four millions; but whether it would be or not, the statute does not authorize the board to substitute for the petition which the electors have presented, a petition based upon an entirely different set of circumstances or to act without any petition at all. There never was a petition presented to the board for the creation of Toole county with an assessed valuation less than four millions, and therefore the order of March 26, calling an election for the creation of a new county with property of the assessed value of only three millions or thereabouts, and much less than four millions of dollars, was without jurisdiction and void.

It is ordered that the proceedings of the board of county commissioners taken on March 26, 1913, including within the boundaries of the proposed Toole county certain territory not theretofore petitioned for, and in excluding from the boundaries

of said proposed county territory for which no proper with-drawal petitions had been presented, and in granting the peti-tions for the creation of said county, defining its boundaries, *etc.*, as set forth in the resolution of that date, adopted by such board; and the resolution adopted on the same day postponing the election to June 25, 1913, and the proclamation for, and notice of, an election to determine whether or not the said county of Toole should be created, made and entered on the 27th day of March, 1913, be and the same are hereby annulled.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SANNER con-cur.