GRANT ET AL., APPELLANTS, v. MICHAELS ET AL., COUNTY
COMMISSIONERS, RESPONDENTS.

(No. 7,105.)

(Submitted May 24, 1933. Decided June 14, 1933.)

[23 Pac. (2d) 266.]

454

*Mr. S. J. Rigney,* for Appellants, submitted a brief and argued the cause orally.

*Mr. W. R. McDonald,* for Respondents, submitted a brief and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Richard Grant, Sr., and other individual plaintiffs who were petitioners for the creation of a school district, with school district No. 7, of Glacier county, have appealed from the judgment of the court refusing to set aside the order of the board of county commissioners of Glacier county, consisting of the defendants A. L. Michaels, Peter Des Rosier and Frank Shannon, which order annulled the order of the county superintendent of schools creating district No. 7 from district No. 9 of Glacier county.

Approximately one-third of Glacier county lies within district No. 9, which extends from the north to the south boundary of the county, a distance of 48 miles. The east boundary of district No. 9 follows township lines, and the southeast portion of the district consists of an area three townships long from east to west and three townships wide from north to south—less two tiers of sections on the north—connected with the remainder of the district only for a distance of 4 miles at the northwest corner. In this area reside more than 300 qualified electors of district No. 9 and more than 200 children of school age, many of whom are without educational facilities and reside more than 15 miles from a school. This condition has resulted in applications made over a period of years to the trustees of district No. 9 for the

establishment of a school in this neglected portion of the district, but without result.

In the fall of 1931, a petition for the creation of a new district was presented to the county superintendent of schools and by her granted, but her action was promptly reversed by the board of county commissioners; thereupon a new petition was circulated and received the signatures of approximately 200 qualified electors of the proposed district. On receipt of this petition the county superintendent gave the required notice of hearing thereon, whereupon a protest signed by 92 persons was lodged against the creation of the district. The county superintendent found that certain of the protestants were not qualified, but the fact is immaterial, as the protest did not contain sufficient signatures to block action on the petition, had they all been qualified. The petitioners and the county superintendent complied with every provision of the law regarding the creation of a school district, and consequently district No. 7 was legally created on October 31, 1931.

On November 4 certain dissatisfied electors of district No. 9 appealed to the board of county commissioners, and four days later the trustees appointed for district No. 7 proceeded to perfect the organization of the district, rent and equip a schoolhouse, and employ a teacher. After hearing, duly noticed, the board by a vote of two to one annulled the order of the superintendent. Thereupon the proponents of the district who were acting as trustees commenced this suit in equity to set aside the order of the board; they made "School District No. 7" a party plaintiff, and, on the filing of their complaint, the district judge issued to the defendants an order to show cause why their order should not be vacated, and therein further ordered that the decision of the board be stayed until the final determination of the proceeding.

The complaint alleges the steps taken in the creation of the district, and shows that the law was fully complied with and that the district was legally created. It shows further the necessity for such a school district, as above indicated, and that the assessable property therein—$218,000—should furnish

sufficient taxes for the conduct of a school. It then alleges that the position taken before the board by the appellants from the order creating the district was that, under the law, the county commissioners had arbitrary authority to disregard any and all evidence and arbitrarily refuse to permit the creation of a school district. It is then alleged that Des Rosier and Shannon, the first of whom is also a trustee of district No. 9, were disqualified from acting by reason of bias and prejudice and their repeated declarations in opposition to the creation of the district prior to the hearing, and that they did "wrongfully, unlawfully, unjustly, oppressively, unreasonably, capriciously and wantonly disregard the evidence submitted and the rights and interests of said 212 school children," and that their order is "null and void and of no legal effect for the reason that it is contrary to the law and the evidence and unsupported by any competent evidence." Later in the complaint it is alleged, in conjunction with all of the adverbs used in the quoted allegation, that the defendants acted "fraudulently" in reversing the order of the superintendent.

The defendants appeared by answer which, except for the admission of formal matters and the statement that defendants "admit that counsel for appellants argued before them that the defendants were the final arbitrators of the case * * * and might decide such appeal as they saw fit and proper," amounts only to a general denial.

On the opening of the trial in the district court, the defendants submitted a certified copy of the minutes of the proceedings before the board as their "return to the writ." The legality and regularity of the petition for the creation of the district, of the steps taken, and of the action of the county superintendent, were conceded. Chairman Michaels testified that no evidence in contradiction of the allegations of the petition was adduced before the board at its hearing. Commissioner Des Rosier was called and testified that he was, and had been for eight years, a trustee of school district No. 9. The plaintiffs sought to show by Des Rosier that he was at all times opposed to the creation of the district, but were not per-

mitted to do so. An offer of proof was made and excluded, as were offers of proof to the effect that the only evidence offered by protestants before the board was as to the advisability and public policy of creating the district, and that no evidence was offered recognized in law as a ground for denying the petition; that no evidence was offered as to the financial standing of district No. 9, or district No. 7, or against the necessity for a district; that evidence was offered showing that a large number of children in the proposed district were, and had been for eight years, without any educational facilities; that they reside from 5 to 25 miles from the only available schools, the one at Browning, the other at the "old Agency"; that district No. 7 would be financially able to maintain sufficient schools for the accommodation of the children.

The plaintiffs attempted to prove by commissioner Michaels what took place on the hearing before the board, but, on the objection that the record before the court showed all that took place, this evidence was excluded.

Thus delimited, the proof adduced by the plaintiffs amounted to nothing more than the submission of the records; the defendants introduced no evidence; consequently this court is in as advantageous a position to pass on the evidence as was the trial court.

The trial court evidently adopted the position taken by counsel for the defendants, as indicated by his admission above, that under the law the commissioners must conduct a hearing on appeal, but, having heard the evidence, "they may decide such appeal as they saw fit and proper." This would seem indicated by the judgment entered.

The only findings of fact, recited in the judgment, are that the county superintendent made an order creating the district; that an appeal was taken to the board of county commissioners; that the board reversed the order, and thereupon this action was begun "to review the proceedings" before the board. As "conclusions of law," the court declared that the board was "clothed with discretionary power in entering their order * * * there is neither pleading nor proof on the

458

part of the plaintiffs that the discretionary powers * * * have been abused in the instant case." On these findings and conclusions the court quashed the order to show cause and sustained the order of the board.

The conclusion of the court that the plaintiffs did not *plead* an abuse of the board's discretionary power is clearly erroneous. The complaint charges, in effect, that in arriving at their decision, the commissioners disregarded all of the evidence showing the legality of the order of the superintendent; had no evidence before them supporting their decision, but arbitrarily, capriciously, wantonly and because of their preconceived prejudice and outspoken antagonism against the creation of the district, they annulled the order of the county superintendent, and that their action was unjust and unreasonable.

The technical points raised by the defendants in support of the judgment are (a) that school district No. 7 never legally came into existence, and therefore was not a proper party plaintiff, and that (b) although sufficiently alleged in the complaint, the plaintiffs did not *prove* that the individual plaintiffs were "taxpayers," and therefore failed· to prove their right to prosecute the suit; (c) that plaintiffs should have resorted to certiorari, and were therefore not entitled to maintain their suit in equity; (d) that, if equity has jurisdiction, it is only in cases showing fraud, oppression or wrongful, unlawful, unreasonable or grossly unjust action; and (e) that, as the defendants pleaded that they acted in good faith and honestly, which allegation was not denied by reply, the equity side of the court had no jurisdiction.

It may be conceded (a) that the order of the county superintendent would not become final until the time for appeal expired and that the perfecting of the appeal, within time, suspended the creation of school district No. 7, and consequently it was not a proper party plaintiff. (b) However, the record establishes without contradiction that the individual plaintiffs were petitioners, and perhaps the most active

ones; were appointed trustees of the new district, and on the trial it was stipulated that they were residents and electors of the proposed district; they were therefore vitally interested and entitled to bring and maintain the action. (*State ex rel. Hall* v. *Peterson*, 55 Mont. 355, 177 Pac. 245; *State ex rel. School District* v. *Trumper*, 69 Mont. 468, 222 Pac. 1064.)

(c and d) We need not extend this opinion by a lengthy discussion of the equitable jurisdiction of the trial court. Under the law (sec. 1024, Rev. Codes 1921, as amended by Chapter 138, Laws of 1927), the action of the board is "final"; therefore no appeal lies either to higher school authority, as in the case of *State ex rel. School Dist.* v. *Trumper*, supra, or to the courts, but "for every wrong their is a remedy" (sec. 8752, Rev. Codes 1921), and, if the law does not provide the remedy, equity will right the wrong. (1 Pomeroy Eq. Jur., 3d ed., 701.) The action instituted is proper and appropriate. (*State ex rel. Examining and Trial Board* v. *Jackson*, 58 Mont. 90, 190 Pac. 295; *Cox* v. *Hall*, 54 Mont. 154, 168 Pac. 519; *State ex rel. Stuewe* v. *Hindson*, 44 Mont. 429, 120 Pac. 485; *Chicago etc. R. Co.* v. *Byron School Dist.*, 37 Wyo. 259, 260 Pac. 537; *Independent School Dist.* v. *County Board*, 155 Minn. 453, 194 N. W. 8.)

(e) The allegations on which defendants now rely are not "new matter," but merely the converse of the allegations of the complaint; they constitute but a method of denying the allegations of bad faith and improper action, thus joining issue. No reply was necessary, and plaintiffs' failure to reply did not constitute an admission of the allegations of the answer.

It has been said that the phrase "abuse of discretion" implies, not merely an error in judgment, but perversity of will, prejudice, passion, or moral delinquency (*Grayson County* v. *Harrell*, (Tex. Civ. App.) 202 S. W. 160; *Citizens St. R. Co.* v. *Heath*, 29 Ind. App. 365, 62 N. E. 107; *Williams* v. *Board of Education*, 79 Kan. 202, 99 Pac. 216, 22 L. R. A. (n. s.) 584), but it does not necessarily imply wrongdoing or a

breach of trust, or import bad faith (*Lyles* v. *Williams,* 96 S. C. 290, 80 S. E. 470; *Root* v. *Bingham,* 26 S. D. 118, 128 N. W. 132) ; it conveys, rather, the idea of acting beyond the limit of discretion (*Browning* v. *Dow,* 60 Cal. App. 680, 213 Pac. 707; *State Board* v. *Brown,* 70 Colo. 116, 198 Pac. 274) ; the disregard of the evidence adduced (*State* v. *District Court,* 213 Iowa, 822, 238 N. W. 290, 80 A. L. R. 339) ; the basing a decision upon incompetent or insufficient evidence (*Katz* v. *Delohery Hat Co.,* 97 Conn. 665, 118 Atl. 88) ; an exercise of discretion to an end or purpose not justified by, and clearly against, reason and evidence (*Trimmer* v. *State,* 142 Okl. 278, 287 Pac. 783; *Seaba* v. *State,* 144 Okl. 295, 290 Pac. 1098) ; a clear error in law in the circumstances (*Tunstall* v. *Lerner Shops,* 160 S. C. 557, 159 S. E. 386; *Heaton* v. *Jackson,* 34 Ohio App. 424, 171 N. E. 364).

The complaint sufficiently charges facts from which an "abuse of discretion" follows, under all of the foregoing definitions. But did the case before the court present the question of the use or abuse of discretion?

If the statute gives to the board the right to decide the question of affirming or reversing the county superintendent's order as it sees fit, the members are not vested with discretion, but with arbitrary power. "Discretion does not mean the arbitrary will or merely individual or personal view." (*State* v. *Canada,* 48 Iowa, 448; *Arthaud* v. *Griffin,* 205 Iowa, 141, 217 N. W. 809.)

In *State ex rel. Hall* v. *Peterson,* supra, this court declared that, under section 405 of Chapter 76, Laws of 1913, the board of county commissioners on appeal was "vested with plenary power" to create a school district. The law as it then existed merely declared that an appeal might be taken to the board of county commissioners. "whose decision shall be final"; it contained no suggestion of a hearing. Whether or not the Hall decision would justify arbitrary action on the part of the board is not now of any consequence, as the present law (Chap. 138, Laws of 1927) provides that, upon transmission of the records and notice of appeal to the county clerk,

the latter "shall, forthwith * * * give notice to all parties interested * * * that the board of county commissioners will [at a designated time and place] finally hear and determine said appeal and said petition," and "upon the hearing * * * a decision shall be rendered which shall be final."

The term "hearing," when used with reference to a proceeding, is an equity term synonymous with "trial," and includes the reception of evidence and arguments thereon for the sake of deciding correctly thereon. (*Vannevar* v. *Bryant,* 21 Wall. (88 U. S.) 41, 22 L. Ed. 476; *Merritt* v. *Village of Portchester,* 8 Hun (N. Y.), 40; *Miller* v. *Tobin,* (C. C.) 18 Fed. 609; *Blair* v. *Curran,* (C. C. A.) 24 Fed. (2d) 390; *Thede* v. *Thornburg,* 207 Iowa, 639, 223 N. W. 386; *Crucia* v. *Behrman,* 147 La. 137, 84 So. 523; *State ex rel. Nissler* v. *Donlan,* 32 Mont. 256, 80 Pac. 244.)

A "hearing" before a board of county commissioners "is analogous to a trial before a justice of the peace. The petitioner * * * is the plaintiff, the protestants are the defendants, and the board * * * is the court." (*State ex rel. More* v. *District Court,* 49 Mont. 577, 143 Pac. 1193, 1194; *State ex rel. Hackshaw* v. *District Court,* 48 Mont. 477, 138 Pac. 1100.) Upon such a hearing the board exercises quasi-judicial powers. (*State ex rel. Lang* v. *Furnish,* 48 Mont. 28, 134 Pac. 297; *State ex rel. Arthurs* v. *Board of County Commrs.,* 44 Mont. 51, 118 Pac. 804.)

The power "to 'hear and determine' is an essential ingredient of jurisdiction, and the quoted words refer to a judicial investigation and settlement of an issue of fact, which implies the weighing of testimony offered on both sides, from a consideration of which the relief sought by the moving party is either granted or denied"; hence a statute requiring the board to "hear and determine" is not complied with by action taken without consideration of the evidence. (*Applegate* v. *City of Portland,* 53 Or. 552, 99 Pac. 890. See, also, *Commonwealth* v. *Simpson,* 2 Grant Cas. (Pa.) 438, 439, citing 4 Bl. Com. 270;

*Stanton* v. *United States,* (C. C.) 37 Fed. 252; *Cole* v. *State,* 102 N. Y. 48, 6 N. E. 277.)

In *State ex rel. Jacobson* v. *Board of County Commrs.,* 47 Mont. 531, 134 Pac. 291, 294, construing the law requiring a "hearing" on petition for a new county, this court said: "The board is required to consider the evidence, weigh the same, and deduce its determination therefrom."

Thus it is manifest that, as in the case of a justice of the peace, the judge in an equity case, or a jury, the members of the board of county commissioners conducting a "hearing" in their quasi-judicial capacity, are the triers of the facts, and, consequently, cannot arbitrarily and capriciously disregard competent, credible and undisputed evidence and decide the matter before them "as they see fit," without evidence supporting their decision. A determination reached and rendered in arbitrary and capricious disregard of unimpeached testimony is "against law." (*Harwood* v. *Scott,* 65 Mont. 521, 211 Pac. 316.)

Evidence as to what was before the board was excluded on the objection and theory that what took place at the hearing and what evidence was before the board was "incompetent, irrelevant and immaterial." On an attempt to secure a "*résumé*" of any evidence adduced by the protestants on the hearing, the same objection was interposed, followed by the statement that "all of the records are before the court and speak for themselves." The objection was sustained. The "records" mentioned include the minute record of the hearing purporting to outline the evidence, but therein the only suggestion of testimony going to the advisability of creating the district is that there are outstanding registered warrants against district No. 9, in the amount of $24,827.67. The practicable questions or considerations as to whether a proposed district would be financially able to function properly, and as to the effect on the financial condition of the district or districts from which it is proposed to carve a new district, enter into the determination of a board, but not to the extent they did

formerly, for the legislature has declared the policy of the state on the subject by requiring the petition for a new district to show that its creation will not reduce the assessed valuation of the old district below $75,000, and that that within the new district is not less than $40,000.

The record discloses that the only subjects discussed by the board in arriving at the decision announced were the "need and advisability" of creating the district. The evidence was clear and undisputed that the people of the proposed district were in need of school facilities and could not secure them except by the creation of a new district. Nor is there anything in the record indicating that its creation would be inadvisable, other than that the severing of the property from district No. 9 would render it more difficult for that district to get back to a cash basis, and that a recently created district (No. 8) had outstanding registered warrants to the amount of $2,316.20.

*Dehors* the record, counsel for the commissioners have called our attention to the fact that the territory embraced within the proposed district is within the Blackfoot Indian Reservation, and that most of the persons interested are Indian wards of the government, and asserts that these are not taxpayers. Counsel asserts that we should take judicial notice of these facts, and further that within such territory there is a large parochial boarding-school, and a large government boarding-school, which schools take care of and board several hundred Indian children, and that each year the Congress finds it necessary to appropriate large sums for the relief, food, clothing, housing and medical care of these people. It is further urged that to create separate schools within the new district in order that none of the 212 children would have to travel more than 4 miles to school "would be to create an impossible tax condition upon the taxable property in that district."

Presumably, these are the considerations which moved the board to reverse the county superintendent, or so counsel would have us understand, but no such showing was made on

the trial before the district court; nor did counsel, or the court, deem such a showing relevant or material.

It will be noted that it is only contended that these 212 children may have educational facilities by attending a "parochial boarding-school" within the district or a government "boarding-school" without the district, but at some point on the reservation. The first thought which occurs to the writer is: If the people of the district are in the dire financial condition pictured, with what will they maintain their children at the parochial boarding-school? Does the government maintain a boarding-school for Indian children without charge, and, if so, is it capable of caring for these children in addition to the "several hundred children" in attendance? On these questions we are not advised. If adequate provision is made for the education of Indian children (contrary to the showing made), how about the white children within the district?

As to the tax burden on property within the new district, it is apparent that, with 212 children of school age, the district would draw a substantial sum from the state annually, and, with $218,000 assessable property, the district should function on a levy not materially greater than that made by district No. 9, whatever that may be. The fact that the district would not be financially able to maintain sufficient schools to permit all children to attend without traveling more than 4 miles is no ground for denying all of the children school privileges or requiring them to travel, as stated, "from four to twenty-five miles."

Section 1 of Article XI of the Constitution declares that "it shall be the duty of the legislative assembly of Montana to establish and maintain a general, uniform and thorough system of public, free, common schools." This is a "solemn mandate" to the legislature for the purpose of insuring to the people the system described. (*Evers* v. *Hudson,* 36 Mont. 135, 92 Pac. 462.) This mandate was obeyed by the legislature in the enactment of laws setting up the machinery for the creation and maintenance of school districts throughout the state. The

number, location and extent of the districts within a county must, of course, be, and is by law, left to local option and governed by circumstances; but the clear intent of the Constitution is that adequate facilities for the education of all children must be furnished, and the legislature has expressed its thought as to what will constitute a "thorough" system, by authorizing the parents or guardians of ten or more children of school age "residing at a greater distance than two miles from any schoolhouse owned by any * * * school district" to petition for a new district. (Chap. 138, Laws of 1927.)

"The common schools are doorways opening into chambers of science, art, and the learned professions, as well as into fields of industrial and commercial activities. Opportunities for securing employment are often more or less dependent upon the rating which a youth, as a pupil of our public institutions, has received in his school work. These are rights and privileges that cannot be denied." (*Piper* v. *Big Pine School Dist.*, 193 Cal. 664, 226 Pac. 926, 930.)

So great is the desire of our people that all children shall receive the benefit of education that, speaking through the legislature they require all persons in authority over children between the ages of eight and eighteen to see that the children receive instruction or subject themselves to the pains and penalties imposed for the commission of a misdemeanor and, to make doubly sure on the subject, provide for truant officers with authority to arrest children and return them to school. (Secs. 1135–1140, Rev. Codes 1921.)

That many of the children of the proposed district are the offspring of illiterate Indians is all the more reason why they should be afforded adequate free public school facilities; their parents cannot instruct them at home, and, while a truant officer is authorized to return truants to a parochial or government school, which they have been attending, the parents of such children cannot be compelled to place their children in such schools or return them thereto if the children leave with their consent.

The government, recognizing the necessity of educating the Indians, has made provision for and established Indian schools, but neither by treaty have the Blackfoot Indians surrendered to the United States the right to compel their children to attend school (if it may be assumed that Indians exercise such authority over their children), nor has the United States assumed to possess or exercise such right. (*United States ex rel. Young* v. *Imoda,* 4 Mont. 38, 1 Pac. 721.) The government boarding-school mentioned does not fill the place of the free common school required by our Constitution, and the fact, if it be a fact, that such a school is open to the children of the proposed district, does not relieve the state of its duty to furnish public school facilities to those children. Even though a government school existed within the territory under consideration, that fact would be immaterial in considering the petition for a district. (*Piper* v. *Big Pine School Dist.,* supra.)

In view of the fact that there was ample undisputed and credible evidence of the regularity and legality of the creation of the district and of the necessity therefor, and that there was no evidence to support the order of the board, the action of the board was oppressive and unjust, and its decision was "against law."

The judgment is reversed and the district court is directed to issue its writ annulling the order of the board.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, ANDERSON and STEWART concur.

Rehearing denied July 1, 1933.