[S. F. No. 10953. In Bank.—June 2, 1924.]

## ALICE PIPER, etc., et al., Petitioners, v. BIG PINE SCHOOL DISTRICT OF INYO COUNTY et al., Respondents.

[1] SCHOOL LAW—ENJOYMENT OF EDUCATIONAL PRIVILEGES EXTENDED BY STATE—NATURE OF RIGHTS.—The enjoyment of privileges extended by the state relating to the education of children in the public schools are enforceable rights vouchsafed to all who have a legal right to attend the public schools which cannot be enjoyed as a matter of right by those who, from choice or compulsion, attend schools without the control, supervision, and regulation of the educational departments of the state.

[2] ID.—EDUCATION OF CHILDREN—OBLIGATION OF STATE.—The education of the children of the state is an obligation which the state took over to itself by the adoption of the constitution, and it is in a sense exclusively the function of the state which cannot be delegated to any other agency.

[3] ID.—EDUCATION OF CHILDREN—STATE AFFAIR.—The privilege of receiving an education at the expense of the state is not one belonging to those upon whom it is conferred as citizens of the United States. The federal constitution does not provide for any general system of education to be conducted and controlled by the national government. It is distinctly a state affair.

[4] ID.—CITIZENS OF STATE—COLOR OR RACIAL DIFFERENCES—ABSENCE OF SEPARATE SCHOOLS—VIOLATION OF FOURTEENTH AMENDMENT OF FEDERAL CONSTITUTION.—The denial to children whose parents, as well as themselves, are citizens of the United States and of this state, of admittance to the common schools solely because of color or racial differences without having made provision for their education equal in all respects to that afforded persons of any other race or color, is a violation of the provisions of the fourteenth amendment of the constitution of the United States, which provides: "nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws."

[5] ID.—ESTABLISHMENT OF SEPARATE SCHOOLS FOR INDIANS—CONSTITUTIONAL LAW.—The establishment by the state of separate schools for Indians, as provided by statute, does not offend against either the federal or state constitutions, but no separation can be had, however, in the absence of statutory or constitutional authority therefor.

Right of Indian children to school privileges, notes, Ann. Cas. 1915C, 482; 50 L. R. A. (N. S.) 147.

[6] ID.—EXCLUSION OF INDIAN CHILD FROM PUBLIC SCHOOL—ABSENCE OF SEPARATE SCHOOL—CONSTITUTIONAL LAW.—An Indian child who is a citizen of this state and a resident of a school district forming a part of the common or public school system of this state cannot be excluded from attendance upon a public school within said school district upon the ground that she is a person of Indian blood, where no separate school for Indian children has been established by the governing body of said school district; and the fact that the United States government under the direction and supervision of the Department of the Interior has established a school for the education and training of members of the Indian race within the territorial boundaries of said school district does not satisfy the requirement of section 5 of article IX of the state constitution that "The legislature shall provide for a system of common schools, by which a free school shall be kept up and supported in each district at least six months in every year," etc.

[7] ID.—COMPULSORY EDUCATIONAL LAW—CONSTRUCTION.—To permit children to attend privately conducted schools and avoid the penalties prescribed for nonattendance upon the public schools, the "Compulsory Educational Law" (Stats. 1921, p. 1673) prescribes an alternative system. This act, however, is in aid of the exercise of a free volition and is not intended as the denial of the right to attend schools supported at the state's expense.

PROCEEDING in Mandamus to compel trustees of a school district and its teacher to admit an Indian child as a pupil. Writ granted.

The facts are stated in the opinion of the court.

J. W. Henderson for Petitioners.

U. S. Webb, Attorney-General, Frank English, Deputy Attorney-General, and Jess Hession, District Attorney, for Respondents.

SEAWELL, J.—This is an application for a writ of *mandamus* to compel the trustees of Big Pine School District of Inyo County, this state, and its teacher, to admit and receive into said school as a pupil thereof, Alice Piper, a female Indian child of the age of fifteen years, and a resident of said district, who has been excluded from attendance upon said school. Big Pine School District is a part of the common or public school system of this state, organized

and maintained in obedience to the constitutional mandate and the general school laws of the state. The guardian *ad litem,* Pike Piper, and his wife, Annie Piper, persons of the Indian race and blood, are the parents of petitioner, Alice Piper. It is admitted by the answer that both parents and petitioner are citizens of the United States and of this state and that neither the petitioner nor either of her parents has ever lived in tribal relations with any tribe of Indians or has ever owed or acknowledged allegiance or fealty of any kind to any tribe or "nation" of Indians or has ever lived upon a government Indian reservation or has at any time been a ward or dependent of the nation. No separate school for Indian children has at any time been established by the governing body of said school district, but the United States government, under the direction and supervision of the Department of the Interior, has established and does now maintain a school for the education and training of members of the Indian race within the territorial boundaries of said school district, to which school petitioner is eligible as a pupil. No objection is made to the admission of petitioner to said public school other than that she is a person of Indian blood. Petitioner alleges, and respondents admit, that she is now and at all times mentioned in said petition has been a person of good habits and character, in good physical health, and that she is in need of and desirous of obtaining an education such as is obtainable in the public schools of this state and that her parents are desirous that she should obtain such an education. As a citizen of the state under the foregoing circumstances she claims the right to be admitted to and received into said school, and challenges the constitutionality of the provisions of section 1662, subdivisions second and third, of the Political Code (Stats. 1921, p. 1160), so far as it attempts to confer upon the governing body of the school district the power to exclude Indian children, because of blood differences alone, from attending a district public school maintained under the authority of the laws of the state, provided the United States government maintains an Indian school within said school district and the Indian children residing within said district are eligible for attendance upon such Indian school, as provided by said subdivisions second and third of section

1662. Said section so far as it directly bears upon the question of the education of Indian children is as follows:

"1662. First—The courses of study for the day elementary schools of California shall embrace eight years of instruction; and such courses must allot eight years for instruction in subjects required to be taught in such schools and may allot not more than two years for kindergarten instruction.

"Second—The day elementary schools of each school district of California shall be open for the admission of all children between six and twenty-one years of age residing within the boundaries of the district, including Indian children whose education may not otherwise have been provided for by the federal government, and may be open for the admission of adults if the governing body of the district deem such admission advisable; *provided,* that where kindergarten instruction is given in the schools of a district, such school shall admit children to the kindergarten classes at four years of age; and the reports for the kindergarten classes shall be kept and shall be made separate from other school reports; *and provided, further,* that wherever a school is established for the instruction of the deaf, such children may be admitted to such school at three years of age; *provided,* that the average daily attendance of deaf children who are six years of age or older shall be counted as part of the average daily attendance in the day elementary schools.

"Third—The governing body of the school district shall have power to exclude children of filthy or vicious habits, or children suffering from contagious or infectious diseases, and also to establish separate schools for Indian children and for children of Chinese, Japanese or Mongolian parentage. When such separate schools are established, Indian children or children of Chinese, Japanese, or Mongolian parentage must not be admitted into any other school.

"*It is further provided,* that in school districts in California where the United States government has established an Indian school, or in an area not to exceed three miles from the said Indian school, the Indian children of the district, or districts, eligible for attendance upon such Indian school, may not be admitted to the district school."

It is a claim of respondents that if the school maintained by the federal government corresponds in all respects in grade, course, and hours of study to state schools and otherwise affords equal educational facilities and advantages with the schools maintained by the state or, as intimated, if they be better adapted to the education of members of the Indian race, petitioners would not be prejudiced by being excluded from said state school and could have no reasonable ground of complaint. Respondents justify their action on the authority of said section 1662 of the Political Code, which they claim to be a valid exercise of legislative power and which in nowise exceeds constitutional limitations. If constitutional guaranties are to be regarded this contention cannot be sustained.

The policy of the law of this state since its organization with reference to the subject of the education of its citizens finds forcible expression in the language of our earlier and present constitution and in legislative enactments. By article IX, section 1, of the state constitution the advantages and necessities of a universally educated people as a guarantee and means for the preservation of the rights and liberties of the people is thus declared: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement." Section 5: "The legislature shall provide for a system of common schools, by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." By other sections the constitution provides for the establishment of elementary, high, day and evening secondary schools, vocational and technical schools, kindergarten schools, normal schools, and teachers' colleges as may be established by the legislature or by municipal or district authority.

The legislature is commanded by the organic law to provide for the appointment or the election of a state board of education whose duty it shall be to provide, compile or cause to be compiled, and adopted, a uniform series of text-books for use in the day and evening elementary schools throughout the state. Such books shall be furnished and distrib-

uted, by the state *free of cost or any charge whatever,* to all children attending the day and evening elementary schools of this state under such conditions as the legislature shall prescribe. Both the constitution and statutes of the state provide for a uniform system and course of study as adopted and provided by the authority of the state. Under this uniform system pupils advance progressively from one grade to another and, upon the record made, are admitted from one school into another pursuant to a uniform system of educational progression. [1] The enjoyment of these privileges are enforceable rights vouchsafed to all who have a legal right to attend the public schools which cannot be enjoyed as a matter of right by those who, from choice or compulsion, attend schools without the control, supervision and regulation of the educational departments of the state. The education of the children of the state, into whose keeping sooner or later, the preservation of the "rights and liberties of the people" must be committed, is not only directed by but also protected and safeguarded by a state board of education vested with supervisory power against the teaching of doctrines that might have the tendency or purpose of destroying the fundamental principles upon which our government rests. [2] It is in a sense exclusively the function of the state which cannot be delegated to any other agency. The education of the children of the state is an obligation which the state took over to itself by the adoption of the constitution. To accomplish the purposes therein expressed the people must keep under their exclusive control, through their representatives, the education of those whom it permits to take part in directing the affairs of state.

[3] The privilege of receiving an education at the expense of the state is not one belonging to those upon whom it is conferred as citizens of the United States. The federal constitution does not provide for any general system of education to be conducted and controlled by the national government. It is distinctly a state affair. (*Civic Center Assn.* v. *Railroad Com.,* 175 Cal. 441 [166 Pac. 351]; *Kennedy* v. *Miller,* 97 Cal. 429 [32 Pac. 558].) [4] But the denial to children whose parents, as well as themselves, are citizens of the United States and of this state, admittance to the common schools solely because of color or racial differences without having made provision for their education

equal in all respects to that afforded persons of any other race or color, is a violation of the provisions of the fourteenth amendment of the constitution of the United States, which provides: "nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws." For an application of this amendment to the subject before us, see 11 Cor. Jur. 805.

The early case of *Ward* v. *Flood*, 48 Cal. 36 [17 Am. Rep. 405], considered the provisions of the constitution of 1849 relative to educational affairs which, in all material respects, were similar to those of the present constitution. There an application for a writ of *mandamus* to compel the admission of a person of African descent into the public schools of the city and county of San Francisco was denied upon the ground that a separate school had been established by the governing body of the district with like facilities and advantages with those maintained for the general public. The court said:

"The opportunity of instruction at public schools is afforded the youth of the state by the statute of the state, enacted in obedience to the special command of the constitution of the state, directing that the legislature shall provide for a system of common schools, by which a school shall be kept up and supported in such district, at least three months in every year, etc. (art. XIX, sec. 3). The advantage or benefit thereby vouchsafed to each child, of attending a public school is, therefore, one derived and secured to it under the highest sanction of positive law. It is, therefore, a right—a legal right—as distinctively so as the vested right in property owned is a legal right, and as such it is protected, and entitled to be protected by all the guarantees by which other legal rights are protected and secured to the possessor. . . . The public law of the state—both the constitution and statute—having established public schools for educational purposes, to be maintained by public authority and at public expense, the youth of the state are thereby become *pro hac vice* the wards of the state, and under the operations of the constitutional amendment referred to, equally entitled to be educated at the public expense. It would, therefore, not be competent to [for] the legislature, while providing a system of education for the youth of the state, to exclude the petitioner and those of her race from

its benefits, merely because of their African descent, and to have so excluded her would have been to deny to her the equal protection of the laws within the intent and meaning of the constitution.''

[5]   The establishment by the state of separate schools for Indians, as provided by the statute, does not offend against either the federal or state constitutions.   Questions of racial differences have arisen in various forms in the several states of the Union and it is now finally settled that it is not in violation of the organic law of the state or nation, under the authority of a statute so providing, to require Indian children or others in whom racial differences exist to attend separate schools, provided such schools are equal in every substantial respect with those furnished for children of the white race.   ''Equality and not identity of privileges and rights, is what is guaranteed to the citizen.''   No separation can be had, however, in the absence of statutory or constitutional authority therefor.   (*Ward* v. *Flood, supra; Wysinger* v. *Crookshank,* 82 Cal. 558 [23 Pac. 54] ; *Crawford* v. *School District etc.,* 68 Or. 388 [Ann. Cas. 1915C, 477, and note, 50 L. R. A. (N. S.) 147, 137 Pac. 217] ; *Lehew* v. *Brummell,* 103 Mo. 546 [23 Am. St. Rep. 895, 11 L. R. A. 828, 15 S. W. 765] ; *United States* v. *Buntin,* 10 Fed. 730, and note; *Roberts* v. *City of Boston,* 59 Mass. (5 Cush.) 198; *People etc.* v. *Gallagher,* 93 N.˙Y. 437 [45 Am. Rep. 232] ; 14 R. C. L., sec. 18, p. 122; 35 Cyc. 1111.)

No dispute arises here as to the political or civil status of petitioner.   She is the descendant of an aboriginal race whose ancient right to occupy the soil has the sanction of nature's code.   Since the founding of this government its policy has been, so far as feasible, to promote the general welfare of the American Indian, even to the point of exercising paternal care, and, whenever he has shown an inclination to accept the advantages which our civil and political institutions offer, to permit him to enjoy them on equal terms with ourselves.   To this end Congress, in 1887, adopted a statute known as the Dawes Act (24 U. S. Stats. at Large, 390 [3 Fed. Stats. Ann., 2d. ed., p. 830; U. S. Comp. Stats., sec. 3951]), which provides as follows: ''  . . . every Indian born within the territorial limits of the United States

who has voluntarily taken up, within said limits, his resi-
dence separate and apart from any tribe of Indians therein,
and has adopted the habits of civilized life, is hereby de-
clared to be a citizen of the United States, and is entitled
to all the·rights, privileges, and immunities of such citizens
whether said Indian has been or not, by birth or otherwise,
a member of any tribe of Indians within the territorial
limits of the United States, without in any manner impair-
ing or otherwise affecting the right of any such Indian to
tribal or other property.'' (*People* v. *Bray,* 105 Cal. 344
[27 L. R. A. 158, 38 Pac. 731]; *Anderson* v. *Mathews,* 174
Cal. 537 [163 Pac. 902].) Petitioner's parents, doubtless,
belong to that group of Indians commonly known as California
Indians, who do not, and have not within the memory of man,
belonged to any tribe of Indians recognized as such by the
United States as a distinct political community and which
are described, and whose political rights are thus defined
in *Anderson* v. *Mathews, supra,* as follows: ''The tribe,
so far as we know, never had a tribal government of
any sort. Admitting that the original tribe may have had
such government, yet the plaintiff's group never had any
form of self-government of any kind. Neither the members
of the group nor, so far as known, the members of the tribe,
were subject to, or owed allegiance to, any government, ex-
cept that of the United States and the state of California,
and, prior to 1848, that of Mexico. The reason for the rule
laid down in *Elk* v. *Wilkins,* 112 U. S. 94 [28 L. Ed. 643,
5 Sup. Ct. Rep. 41, see, also Rose's U. S. Notes], declaring
that a tribal Indian is not a citizen of the United States, is
wholly wanting here, and therefore this case is governed by
the general rule that the place of birth confers citizenship.
The plaintiff and his group rather belong to that class of
Indians described in *Danzell* v. *Webquish,* 108 Mass. 133,
and *Fletcher* v. *Peck,* 6 Cranch (U. S.), 146 [3 L. Ed. 181,
see, also, Rose's U. S. Notes], as Indians who have lost their
power of self-government and become subject to state laws,
and who accordingly must be citizens by birth, since they
have never been subject to any jurisdiction other than that
of the United States.'' (See, also, 13 Cal. Jur. 1062; 31
Cor. Jur. 482.)

[6] Respondents' contention that section 5, article IX,
state constitution, which provides that ''The legislature shall

provide for a system of common schools, by which a free school shall be kept up and supported in each district at least six months in every year," etc., is satisfied by the establishment of the federal school in question, is answered by the patent fact that the mandate of the constitution has been wholly ignored and no legislation whatever has been had in compliance therewith so far as this petitioner is concerned. To argue that petitioner is eligible to attend a school which may perchance exist in the district but over which the state has no control is to beg the question. However efficiently or inefficiently such a school may be conducted would be no concern of the state. The public school system of this state is a product of the studied thought of the eminent educators of this and other states of the Union, perfected by years of trial and experience. Its adaptability to the genius of western development and expansion makes it peculiarly important to those who choose to remain in this state where its influence will be felt. Each grade forms a working unit in a uniform, comprehensive plan of education. Each grade is preparatory to a higher grade, and, indeed, affords an entrance into schools of technology, agriculture, normal schools, and the University of California. In other words, the common schools are doorways opening into chambers of science, art and the learned professions, as well as into fields of industrial and commercial activities. Opportunities for securing employment are often more or less dependent upon the rating which a youth, as a pupil of our public institutions, has received in his school work. These are rights and privileges that cannot be denied.

Respondents cite in support of their position subdivisions 3 and 4 of section 1 of an act entitled: "An act to enforce the educational rights of children and providing penalties for the violation of this act" (Stats. 1921, p. 1673), commonly referred to as the "Compulsory Educational Law," which permits children to attend privately conducted schools provided the tutors or instructors of such schools are capable of teaching, and provided, further, that such institutions shall offer instruction in the several branches of study required to be taught in the public schools of this state. Other provisions not important to this discussion, such as the keeping of an attendance record, are within its terms. We think those permissive sections do not strengthen re-

193 Cal.—43

spondents' position and are not relevant to the issue presented. Those sections give to the child or parent or guardian of such child the right to exercise a volition—a choice—as to the kind of school the child shall attend. [7] To permit children to attend privately conducted schools and avoid the penalties prescribed for nonattendance upon the public schools, the compulsory attendance law prescribes an alternative system. This act, however, is in aid of the exercise of a free volition and is not intended as the denial of the right to attend schools supported at the state's expense. We deem it unnecessary to go further in this direction.

Respondents call our attention to the serious effect that the issuance of the writ will have upon the respondent district. Big Pine School District is located in a sparsely settled portion of the state and contains a number of Indian children, who, it is fairly inferable, attend the Indian or federal school, either as a matter of choice or under the belief that they may not, as a matter of right, attend the district school. It appears from the papers in the case that children of nontaxpaying Indian parents are, by government rule or upon other authority, eligible to attend the federal school, but Indian children whose parents are taxpayers are not admitted into said school. The effect of this decision, it is suggested, will probably cause a greatly increased attendance of Indian children upon the district school who cannot be cared for because of the economic or administrative problem which it will create. No doubt it would add to the cost of the district should it be required to maintain a separate school for Indian children, but this is a consequence for which the courts are not responsible. The economic question is no doubt an important matter to the district, but it may very properly be addressed to the legislative department of the state government.

The constitutional guarantees involved in this case are imperative and must be given effect. Petitioner is entitled to be received as a pupil into the school conducted by the governing body of the school district of which she is a resident and a citizen.

The writ will therefore issue.

Lawlor, J., Waste, J., Lennon, J., Richards, J., Myers, C. J., and Shenk, J., concurred.