[Civ. No. 14117.   Second Dist., Div. 3.   Mar. 8, 1944.]

CHRISTINE BURKHARDT, Respondent, v. LEE LOF-
TON et al., Appellants.

DOLE M. BURKMAN et al., Respondents, v. MAE LIDDY
et al., Defendants; LEE S. LOFTON et al., Appellants.

DOLE M. BURKMAN et al., Respondents, v. HENRY
LAWS et al., Appellants.

232

Thomas L. Griffith, Jr., and Loren Miller for Appellants.

William C. Bartlett and Lindstrom & Bartlett for Respondents.

SHINN, J.—A judgment was rendered in three actions, consolidated for trial, enjoining defendants Lofton and Laws from using or occupying two lots in Tract 7421, in the county of Los Angeles, of which they are the respective owners. All of Tract 7421, consisting of some 500 lots, is subject to a restriction that the premises shall not be leased, sold or conveyed to, or used or occupied by, any person not of the Caucasian race. All of the above named defendants are Negroes and they have appealed from the consolidated judgment. In one case Christine Burkhardt was plaintiff; in each of the other two cases twenty-four other persons were plaintiffs, all of them being owners of lots in the tract.

Before any of the lots in the tract were offered for sale, the owner, Bank of Italy, recorded a document declaring the property to be subject to certain restrictions, including that heretofore stated, and declaring that it "hereby certifies and declares that it has established and does hereby establish a general plan for the improvement and development of said tract, and does hereby establish the provisions, conditions, restrictions and covenants upon and subject to which all lots and portions of lots in said tract, herein referred to as 'said property,' shall be improved or sold and conveyed by it as such owner, each and all of which is and are for the benefit of each owner of land in said property, or any interest therein, and shall inure to and pass with each and every parcel of said property and shall apply to and bind the re-

spective successors in interest of the principal owner or owners thereof, and are and each thereof is imposed upon said property as a servitude in favor of each and every such parcel of land therein as the dominant tenement or tenements.'' The restrictions were conditions subsequent, for breach of which title was to revert to the bank and its successors in interest of the reversion. The document further provided that ''The Bank of Italy hereby reserves the right to modify at its discretion the provisions, conditions, restrictions and covenants herein contained.'' It is not contended that the Bank of Italy ever modified any of said provisions, conditions, restrictions and covenants, nor is it contended that any lots were sold or conveyed except subject to the restrictions.

The validity of this type of restrictions has frequently been upheld in California. (*Los Angeles Investment Co.* v. *Gary* (1919), 181 Cal. 680 [186 P. 596, 9 A.L.R. 115]; *Janss Investment Co.* v. *Walden* (1925), 196 Cal. 753 [239 P. 34].)

Defendants' first contention is that the restrictions were not binding upon the grantees because of the right reserved by the bank to modify them. No authority is cited which supports the proposition that such reserved right rendered the restrictions wholly inoperative. No modifications were attempted, and it is unnecessary to consider whether any could have been made after the sale of lots had commenced. Uniformity in the development and use of the lots in the tract was of the essence of the plan, and it is scarcely to be supposed that the reservation was understood by the bank and the purchasers as reserving to the bank the right to defeat that primary purpose. As we have seen, the lots were agreed to be sold and they were sold subject to the restrictions and the restrictions have been observed in all instances except in the cases of the appellants and in the case of another owner who was named as a defendant but as to whom the case was not tried. Under these circumstances it is immaterial that the grantor inserted in the document which imposed the restrictions the reservation in question. Its meaning is open to question but it certainly cannot be said that by reason of it the plan of development was defeated. In any event, the restrictions were good in their original form unless and until an effort should be made to alter them and they were effective to create an equitable servitude in favor of the owners of the several lots in the

tract. In that respect the case differs factually from *Wing* v. *Forest Lawn Cemetery Assn.* (1940), 15 Cal.2d 472 [101 P. 2d 1099, 130 A.L.R. 120], relied upon by appellants, and in which no equitable servitude had been created.

A further argument is that the restrictions were void because they were not limited as to time, and upon this point defendants rely upon certain statements made in *Foster* v. *Stewart* (1933), 134 Cal.App. 482 [25 P.2d 497]. Appellants misconstrue the holding in that case. The agreement there under consideration had been signed by some of the owners of lots in the tract and not by others and the court had found that it was not intended to go into effect until all had signed. The agreement sought to impose restraints upon ownership as well as upon use, and the court construed the agreement as an unlimited restraint of alienation as to time because no time was specified, and held that there could be "no segregation of the reasons or inducements for the signing thereof by the respective lot owners." We understand that by this the court meant that the agreement that there should be no ownership by any person not of the Caucasian race and no use or occupancy by such person constituted the entire consideration which induced the owners to enter into the agreement and that the agreement, being ineffective to prevent ownership by Negroes, could not be held valid as an agreement of the parties to restrict the use of the property. Sections 711 and 715 of the Civil Code, and *Title Guarantee & Trust Co.* v. *Garrott* (1919), 42 Cal.App. 152 [183 P. 470], were cited only in support of the statement that a restriction against ownership or transfer is in restraint of alienation, for in the cited case it was said (at p. 162): "Certain it is that a restriction upon use only is not within the letter or spirit of section 711 of the Civil Code, or of the common-law doctrine of which that section is a codification." If we were in agreement with what was said in *Foster* v. *Stewart* respecting the reasons and inducements which led the lot owners to sign the agreement, we would hold it inapplicable to the act of the bank in placing restrictions upon the lots in Tract 7421.

If the restriction against use and occupancy is challenged as unjust and unreasonable and therefore unenforceable in equity, because unlimited as to time, the unreasonableness must appear as a reality, rather than as a mere possibility. If it was a just and reasonable restriction and one which would have been enforced under the conditions that existed

at the time the development of the tract was undertaken, it would continue to be just and reasonable as long as those conditions remained substantially unchanged.

Appellants alleged in their answers, and endeavored to prove at the trial, that because of the increase in Negro population the community in which the tract is situated and the tract itself have changed in character so that it would be unjust and inequitable both to plaintiffs and defendants to enforce the racial restrictions. It was alleged that the property in the tract no longer had any "reasonable or adequate sale or rental value to persons of the Caucasian race and that a reasonable and adequate sale or rental value can be secured only through its sale or rental for use and occupancy to persons other than those of the Caucasian race." The findings, which were comprehensive and explicit, fully negatived the facts alleged by defendants by reason of which they claimed that because of changed conditions it would be inequitable to enforce the restrictions. Among the findings on that issue was the following: "The Court further finds with reference to the issues raised by said special defense, and by the special defenses in other answers in said consolidated actions, that said Tract No. 7421 contains nearly 500 lots, that it is eight blocks long from north to south, and two long blocks in width from east to west; that it is bounded on the north by Firestone Boulevard, on the east by Zamora Street, on the south by East Ninety-second Street, and on the west by Central Avenue; that said tract contains no property occupied by persons who are non-Caucasians except the three lots which are the subject of the within consolidated actions, to wit, Lot 374 occupied by defendant Vincent Tenchavez, a Filipino, Lot 498 occupied by defendants Lee S. Lofton and Jennie P. Lofton, who are Negroes, and Lot 500 occupied by defendants Henry Laws, Anna Laws and Pauletta Laws, who are Negroes; that none of the adjoining tracts of land are used or occupied by others than those of the Caucasian race, except the Pardee Tract which adjoins the southerly portion of the easterly boundary of the tract in question and the Central Gardens Tract which adjoins the easterly half of the southerly boundary of the tract here involved. There is some evidence that a small tract, No. 7593, adjoining the remaining half of the southerly boundary of Tract No. 7421, is used for business and by other than those of the Caucasian race, and the Court so finds. The Court further finds

that said Pardee Tract and said Central Gardens Tract were subdivided and on the market before Tract No. 7421, and neither of said tracts was ever restricted as to racial use; that before Tract No. 7421 was so subdivided, these other three tracts were very sparsely settled, but even then a portion of the occupants of each was of other than the Caucasian race; that this was all known to the persons who placed Tract No. 7421 on the market.

"The Court further finds that all of the tracts in the community in which Tract No. 7421 is situated are occupied almost exclusively by residences of modest cost; that throughout this entire section of the County the population has increased very greatly since said Tract No. 7421 was placed on the market in 1923; that while for a time in the three tracts adjacent to said Tract No. 7421 above mentioned the colored population gained over the white, nevertheless, for the past five years the tendency has been definitely reversed. That there is no evidence that there has been any change in the conditions surrounding the subject tract, unless an increase in population in general, including Caucasians as well as non-Caucasians in the three above mentioned tracts adjacent to said Tract No. 7421 is called a changed condition, and the Court expressly finds that such is not a changed condition when applied to a restriction as to racial occupancy."

█ These findings are amply supported by the evidence, and in fact contrary findings would have been unwarranted. The most that is claimed by appellants is that the evidence upon the issue of changed conditions preponderated in their favor, and this, of course, if true, would not be enough to overturn the findings, which were based upon an abundance of substantial evidence.

█ Another pleaded defense was that plaintiffs were guilty of laches in failing to assert their rights promptly after knowledge of the purchases and occupancy of lots by appellants. As to this defense the finding of the court was as follows: "The Court further finds, with reference to the issues raised by said special defense of laches in said Fifth separate and affirmative defense in said answer any in other answers in said consolidated actions, that none of the plaintiffs in said actions is chargeable with laches and the special defense of laches in said actions is untenable. In that behalf the Court finds that all of said plaintiffs and various other owners of lots in said Tract No. 7421 were very active in the

defense of their restrictions; meetings were held every two weeks and upon discovery of their entry into said tract as users or occupants, defendants Vincent Tenchavez, Lee S. Lofton, Jennie P. Lofton, Henry Laws and Pauletta Laws were each, respectively, notified promptly that they were violating the said restrictions and that enforcement measures would be taken and defendants Mae Liddy and Bertha Tenchavez were likewise so advised. That each of said defendants knew of and accepted the risk involved in what they did in violating or permitting the violation of said restriction as to occupancy by others than those of the Caucasian race. That none of the defendants in any of said actions is in a *postion* to say that he or she was misled or lulled into a sense of security with reference to the enforcement of said restriction.'' This finding also is supported by the evidence, which shows that the lot owners of the tract were reasonably vigilant and alert in taking action to prevent the violation of the restriction in question.

The defendants made a motion to require the bringing in as parties defendant of each and every lot owner in Tract 7421, some 346 in number, upon the ground that they were necessary parties to a complete determination of the controversy. This motion was denied and the ruling is assigned as error. Defendants did not by demurrer or answer plead that there was a defect of parties in that the owners of all of the other lots in the tract were not joined as plaintiffs in the action. Consequently the objection was waived. (Secs. 430, 433, 434, Code Civ. Proc.)     But aside from that fact, the plaintiffs had a complete right and cause of action in each case, the determination of which did not necessitate the bringing in of the other lot owners. Plaintiffs were seeking no relief either for or against them. If defendants had sought a declaration of their rights as against the other owners there was other procedure by which that could have been accomplished.

Appellants make the further claim that they were not bound by the restrictions because the Bank of Italy, after it closed the trust, reconveyed some of the lots to the original trustors, from whom appellants purchased their lots, and it is contended that because these deeds did not specifically set forth the restrictions, the lots were conveyed free from restrictions. But the deeds from the bank to the original trustors were quitclaim deeds and they recited that the con-

veyances were made "subject to any and all matters of record." Defendants Lofton were shown to have had actual knowledge of the restrictions before they made their purchase. The other defendants admittedly had constructive knowledge of the restrictions, which were of record, and they were bound equally with those who had both constructive and actual knowledge.

The further contention is made that the restriction in question deprives defendants of property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States. The arguments advanced do not differ from those which have many times been held untenable. (*Los Angeles Investment Co.* v. *Gary, supra,* 181 Cal. 681; *Corrigan* v. *Buckley* (1925), 271 U.S. 323 [46 Sup.Ct. 521, 70 L.Ed. 969]. See, also, *National Federation of Ry. Workers* v. *National Mediation Board* (1940), 110 F.2d 529.)

It is also claimed that defendants have been denied equal privileges and immunities which are guaranteed to them by sections 1 and 21, article I, of the Constitution of California. The cases which defendants rely upon are not in point. *Stone* v. *Board of Directors of Pasadena* (1941), 47 Cal. App.2d 749 [118 P.2d 866], sustains the right of Negroes to use a municipal swimming pool. *Piper* v. *Big Pine School Dist.* (1924), 193 Cal. 664 [226 P. 926], and *Ward* v. *Flood* (1874), 48 Cal. 36 [17 Am.Dec. 405], upheld the right of Indian and Negro children to attend public schools. *Sacramento O. etc. Home* v. *Chambers* (1914), 25 Cal.App. 536 [144 P. 317], held invalid the provision of section 2289 of the Political Code, as amended in 1913, which undertook to deny admittance to and support by an orphanage of children who were citizens but whose parents were aliens, while granting those privileges to other citizens. No question as to the right of citizens to contract with each other with relation to their own property was involved in any of the cited cases, and that right should not be confused with the power to legislate which is possessed by municipal and state governments. The decree of the trial court in the instant case was not, within constitutional principles, action by the state through its judicial department. Plaintiffs' rights are derived from their contract, the subject matter of which belonged exclusively to the contracting parties. The decree appealed from created no rights in plaintiffs; it only declared what they are and pro-

vided for their enforcement. If the contract is valid it cannot be nullified under any theory that courts are without the power to enforce it.

Defendants further argue that racial restrictions are against "the present public policy of the nation and of this state." They quote section 51 of the Civil Code as supporting this argument. This section guarantees to all citizens equal accommodations of inns and certain other public establishments, subject to conditions applicable alike to all citizens. This, of course, establishes the policy of the state as far as it goes but no further than that. Limitations upon the use of real property such as the one under consideration have never been declared to be against public policy by legislative authority, so far as we are advised, and they have been uniformly upheld by the courts. Racial restrictions have been employed in the development of countless residential communities and have very generally been considered essential to the maintenance and stability of property values. Non-Caucasians are and always have been just as free to restrict the use and occupancy of their property to members of their own races as Caucasians have been. The fact that the members of the Caucasian race have freely availed themselves of this right throughout the nation, even though those of the non-Caucasian races have not, is the most satisfactory proof of the public policy of the nation with respect to this phase of the right to contract. No doubt public policy changes and develops with the times, but these changes must have their sources in the citizenry and not in the decisions of courts or the pronouncements of publicists and politicians. The right to contract with reference to their own property is one that is preserved to all citizens and, except where restricted by law, is a right which the peoples of all races may exercise freely. It cannot be denied by the courts to those who make use of it in certain situations because others similarly situated may choose not to avail themselves of it. The responsibility of striking down the validity of racial restrictions with respect to the use and occupancy of real property is one which no court or judge should assume on the strength of individual theories as to what constitutes the "present" public policy on the subject or of personal belief that the consequences would be for the general good. The desirability of a more understanding and harmonious relationship among the many races of our nation is something no one will deny, but it will

come only with time and experience and it is a matter in which public thought and conscience cannot be directed or controlled by the courts through the uprooting of firmly established precedent. The appeals from orders denying motions for new trial are dismissed.

The judgment is affirmed.

Desmond, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied April 3, 1944, and appellants' petition for a hearing by the Supreme Court was denied May 4, 1944.