543 P.2d 1176 (1975)
88 N.M. 548
Walter PRINCE, Phil Foutz, Lawrence J. Stock, Karl G. Ashcroft, Jr., Raymond Comstock, Clarence H. Williams, Charles E. Beavers, John Brimhall and Bill Davie, Plaintiffs-Appellants,
v.
BOARD OF EDUCATION OF CENTRAL CONSOLIDATED INDEPENDENT SCHOOL DISTRICT NO. 22, Defendant-Appellee.
No. 10061.
Supreme Court of New Mexico.
December 22, 1975.
*1177 Tansey, Rosebrough, Roberts & Gerding, Charles M. Tansey, Jr., Farmington, for plaintiffs-appellants.
Caton & Hynes, Byron Caton, Farmington, for defendant-appellee.

OPINION
McMANUS, Chief Justice.
The plaintiffs herein all reside in the Central Consolidated Independent School District No. 22 (District) in northern New Mexico. Plaintiffs brought suit against the District in San Juan County District Court asking, first, that the court set aside a school board election and determine that a six million dollar bond issue proposed was defeated because illegal votes were cast; and, second, that the court enter a declaratory judgment finding that the District could not legally construct or improve buildings on Indian reservation land neither owned by it nor under its exclusive jurisdiction. Defendant filed a motion to dismiss both claims. After a hearing, the court granted the motion to dismiss the first claim and denied the motion as to the second claim. Trial was then held on the second claim and judgment was entered in favor of the District. Plaintiffs appeal from the court's order dismissing the first claim, and from the judgment entered in favor of the District on the second claim. We affirm.
The District in which the general obligation bond issue was passed contains land both on and off the Navajo reservation, though entirely within New Mexico. Approximately two-thirds of the pupils in the District are Indian children who reside on the reservation. In accordance with the provisions of the New Mexico Enabling Act, which is embodied in article XXI of the state constitution, and also in accordance *1178 with the interpretation of our Enabling Act by the United States Supreme Court in Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), the lands within the Navajo Reservation are not subject to the taxes of New Mexico. The appellants argue that the Indian citizens who reside on this nontaxable land should not have been allowed to vote in the District bond election since they do not share the burden of repayment of the indebtedness created by the issuance of the bonds. In effect, they contend that there should be no representation without taxation.
In support of this argument, the appellants cite N.M.Const. art. IX, § 11, which provides:
"No school district shall borrow money except for the purpose of erecting, remodeling, making additions to and furnishing school buildings or purchasing or improving school grounds or any combination of these purposes, and in such cases only when the proposition to create the debt has been submitted to a vote of such qualified electors of the district as are owners of real estate within the school district and a majority of those voting on the question have voted in favor of creating such debt. No school district shall ever become indebted in an amount exceeding six per cent [6%] on the assessed valuation of the taxable property within the school district as shown by the preceding general assessment." (Emphasis added.)
On four separate occasions the U.S. Supreme Court has declared unconstitutional similar statutory schemes restricting the franchise to property owners as violative of the equal protection clause. Hill v. Stone, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In addition, the Supreme Court of New Mexico has specifically declared this provision in our state constitution to be violative of the equal protection clause of the United States Constitution. Board of Education of Vil. of Cimarron v. Maloney, 82 N.M. 167, 477 P.2d 605 (1970). The only issue concerning this state constitutional provision which remains to be resolved here is whether the state has a compelling interest to exclude the reservation residents from the bond election and should, therefore, have excluded them. We look to the various U.S. Supreme Court cases cited above to answer this question.
In Phoenix v. Kolodziejski, supra, the City of Phoenix, Arizona, held an election to authorize the issuance of $60,450,000 in general obligation bonds as well as certain revenue bonds. The general obligation bonds were to be issued to finance various municipal improvements. Pursuant to an Arizona constitutional provision, only otherwise qualified voters who were also real property taxpayers were permitted to vote on these bond issues. In Phoenix v. Kolodziejski, supra, 399 U.S., at 212-13, 90 S.Ct. at 1995, it was stated:
"We thus conclude that, although owners of real property have interests somewhat different from the interests of nonproperty owners in the issuance of general obligation bonds, there is no basis for concluding that nonproperty owners are substantially less interested in the issuance of these securities than are property owners. That there is no adequate reason to restrict the franchise on the issuance of general obligation bonds to property owners is further evidenced by the fact that only 14 States now restrict the franchise in this way; most States find it possible to protect property owners from excessive property tax burdens by means other than restricting the franchise to property owners. The States now allowing all qualified voters to vote in general obligation bond elections do not appear to have been significantly less successful in protecting property values *1179 and in soundly financing their municipal improvements. Nor have we been shown that the 14 States now restricting the franchise have unique problems that make it necessary to limit the vote to property owners. We must therefore affirm the District Court's declaratory judgment that the challenged provisions of the Arizona Constitution and statutes, as applied to exclude nonproperty owners from elections for the approval of the issuance of general obligation bonds, violate the Equal Protection Clause of the United States Constitution. (Footnote omitted.)"
Our own New Mexico case, Board of Education of Vil. of Cimarron v. Maloney, supra, involved a special school bond election for the purpose of voting on the question of whether the school district there involved should create a debt by issuing its general obligation bonds in the sum of $97,000 for the purpose of erecting, furnishing, remodeling and making additions to school buildings.
The vote was in favor of the issuance of the bonds. When the Board of Education sought a certification of approval from the attorney general, it was refused on the grounds that there was no showing that a majority of the then owners of real estate within the school district had voted in favor of creating the general obligation bond debt as required by N.M.Const. art. IX, § 11. This court granted the petition of the Board of Education for a writ of mandamus requiring the attorney general to approve the bond issue. Citing Phoenix v. Kolodziejski, supra, as controlling, the court stated, in Board of Education of Vil. of Cimarron v. Maloney, supra:
"The Supreme Court of the United States has considered the very same question now before this court and has declared that a provision in a state constitution, which only allows owners of real estate to vote on the question of creating a debt through the issuance of bonds, is unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." 82 N.M. at 167, 477 P.2d at 607.
The United States Supreme Court applied this same reasoning in the case of Kramer v. Union School District, supra, which involved a New York law providing that in order to be eligible to vote in certain school district elections, an otherwise qualified district resident had to be (1) the owner or lessee of taxable real property located in the district, (2) the spouse of one who owns or leases qualifying property, or (3) the parent or guardian of a child enrolled for a specified time during the preceding year in a local district school. The court held that law violated the equal protection clause of the fourteenth amendment to the U.S. Constitution because such a classification permitted inclusion of many persons who had only a remote and indirect interest in school affairs, and excluded others who had a distinct interest in school district affairs. The court went on to say:
"Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest. * * *" 395 U.S. at 626-27, 89 S.Ct. at 1889-1890 (1969).
As recently as May, 1975, the United States Supreme Court held unconstitutional a Texas statute that limited voting on local bond issues to persons who had "rendered" (i.e. listed) real, mixed or personal property with the local tax assessor-collector for taxation in the election district in the year of the election. Hill v. Stone, supra. Referring to Phoenix v. Kolodziejski, supra; Kramer v. Union School *1180 District, supra, and Cipriano v. City of Houma, supra, the court stated:
"The basic principle expressed in these cases is that as long as the election in question is not one of special interest, any classification restricting the franchise on grounds other than residence, age, and citizenship cannot stand unless the district or State can demonstrate that the classification serves a compelling state interest." 95 S.Ct. at 1643.
We conclude that, as in Kramer v. Union School District, supra, the election involved in this case was one of general rather than special interest. The State of New Mexico had no compelling interest in the exclusion of Reservation residents from the district bond election, and properly included them. The parents of the children who live on the Reservation have a distinct interest in the district affairs.
We also conclude that art. IX, § 11, of our state constitution violates the equal protection clause of the U.S. Constitution by restricting the right to vote in school district bond elections to real estate owners. Likewise, that section of our statutes which implements art. IX, § 11, of our constitution, § 77-15-2, N.M.S.A. 1953, conflicts with the equal protection clause of the U.S. Constitution insofar as it restricts the franchise in school district bond elections to real estate owners or to those who have paid a property tax on property in the school district for the preceding year. Both attempted restrictions on the franchise are unconstitutional and must fall.
While the above considerations are determinative of the issue, there is another observation which should be made in response to appellants' claim that they will be liable for the retirement of a six million dollar bond issue despite the fact that many of the schools to be constructed and maintained with the proceeds of the bond issue will be built on the Reservation. While it is true that the Reservation Indians in the District do not pay any property taxes, it is not true that the off-Reservation property owners pay the bulk of the District taxes which will be used to repay the bonds.
The appellants and appellee stipulated to the fact that the bonds will be repaid from taxes on both taxable real and taxable personal property in the District. They further stipulated that the valuation of the District's property is as follows:

 A. Corporate Property
 Arizona Public Service $ 38,632,981.00
 Salt River Project 5,484,230.00
 Southern California Edison 26,040,794.00
 Tucson Electric 9,755,130.00
 El Paso and other corporate 38,284,000.00
 Production Equipment 619,405.00
 _______________
 $118,816,540.00
 B. Non-Corporate Property
 Valuation of fee land and
 non-corporate personal property 3,470,427.00
 _______________
 Total $122,286,967.00
 Corporate property in District 97%
 Non-corporate property and fee land 3%

Not all of this corporate property is located on the Navajo Reservation, but most of it is. Those corporations which do have property located on the Reservation lease their land from the Navajo tribe. The land itself is not taxable property, but the corporate buildings and equipment on the leased land are assessed and taxed by the San Juan Board of County Commissioners as taxable personal property. Thus much of the money which will be used to repay the bond debt will be derived from corporations that lease Navajo Reservation lands.
Appellants argue that the Navajo Reservation Indians will not share, either directly or indirectly, in the burden of repaying the bond debt. In support of this argument appellants cite that part of the New Mexico Enabling Act which is contained in art. XXI, § 2 of the State Constitution, and McClanahan v. Arizona State Tax Comm'n., 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). This argument raises but fails to articulate the main issue which *1181 is whether the tax imposed by the State of New Mexico on the property of corporations leasing land on the Reservation from the Navajo tribe is somehow precluded by the New Mexico Enabling Act and McClanahan, supra.
Article XXI, § 2 of the New Mexico Constitution provides:
"The people inhabiting this state do agree and declare that they forever disclaim all right and title * * * to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through the United States, or any prior sovereignty; and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States; * * * [and] that no taxes shall be imposed by this state upon lands or property therein belonging to or which may hereafter be acquired by the United States or reserved for its use; * * *."
This section of our constitution clearly precludes the state from taxing Indian lands and Indian property on the reservation. In McClanahan, supra, the U.S. Supreme Court interpreted an identical provision in the Arizona Constitution as prohibiting the State of Arizona from imposing its personal income tax on a Reservation Indian whose entire income derived from Reservation sources. Neither that section of the New Mexico Enabling Act quoted above, nor the McClanahan case, supra, would prevent the State of New Mexico from imposing a tax on the property of non-Indian corporations leasing land from the Navajo tribe, despite the fact that the property might be located on the Reservation. The land itself cannot be taxed, but the non-Indian property can, because such property does not belong to, nor may it be acquired by the United States or reserved for its use. It is private property owned by non-Indians who are not performing a federal function. It is subject to the taxing powers of this state. Private non-Indian corporations cannot escape their obligation to pay state taxes by locating their property on Indian reservations. Nothing that the U.S. Supreme Court has ever held would imply such an absurd result, nor is there any federal statute or treaty which forbids the imposition of such a tax, since it does not in any way infringe on the right of reservation Indians to make their own laws and be ruled by them. See Mescalero Apache Tribe v. Jones, supra; Oklahoma Tax Comm'n.v. Texas Co., 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949); United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903); Thomas v. Gay, 169 U.S. 264 (1885); Agua Caliente Band of Mission Ind. v. County of Riverside, 442 F.2d 1184 (9th Cir.1971), cert. denied, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972); Norvell v. Sangre de Cristo Development Company, Inc., 372 F. Supp. 348 (D.N.M. 1974). Cf. United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958).
For all of these reasons the district court was correct in dismissing plaintiff's first cause of action, and we affirm that dismissal.
The second point upon which the appellants rely is that the District has no authority to apply the proceeds obtained from the issuance of the bond towards the construction and maintenance of school buildings on the Navajo Reservation. Appellants argue that art. XII, § 3, of the New Mexico Constitution precludes school districts from building and maintaining schools on lands located on the Navajo Reservation and leased from the Navajo tribe. That section of our constitution provides:
"The schools, colleges, universities and other educational institutions provided for by this Constitution shall forever remain under the exclusive control of the state, and no part of the proceeds arising from the sale or disposal of any lands *1182 granted to the state by Congress, or any other funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational or private school, college or university."
The purpose of this section of our constitution is to insure exclusive control by the state over our public educational system, and to insure that none of the state's public schools ever become sectarian or denominational. Were the state public schools to become sectarian, or even overly controlled by sectarian influences, that might well be violative of the first amendment to the U.S. Constitution which prohibits Congress and, through the fourteenth amendment, the states, from making any law respecting an establishment of religion, or prohibiting the free exercise thereof. See Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Zellers v. Huff, 55 N.M. 501, 236 P.2d 949 (1951).
However, even assuming that art. XII, § 3, N.M.Const., would apply to the situation here, we see no reason to doubt that any schools built by this state on leased lands shall remain under the exclusive control of the state for so long as the term of the lease. We interpret "control" to mean control over the curriculum, disciplinary control, financial control, administrative control and, in general, control over all of the affairs of the school. The fact that some of the schools to be constructed from the proceeds of the bond issue will be located on Reservation lands leased from the Navajo tribe will not prevent the state from exercising exclusive control over such schools.
The District does not deny that a substantial portion of the proceeds from the bond issue would be used to construct and maintain schools located on Reservation lands leased from the Navajo tribe. In fact, they offered into evidence at the trial a fifty-year lease with a fifteen-year option between the District and the Navajo tribe relating to a certain piece of property on the Reservation on which the District intends to build a new elementary school. The lease has been approved by the Secretary of the Interior as required by 25 U.S.C. § 415 (1970) which allows the Navajo tribe to lease land on their Reservation for educational purposes for a term not to exceed ninety-nine years. The District also introduced evidence that the useful life of a school building as established by the State Board of Education is thirty years.
The appellants argue that the District will be precluded from exercising exclusive control over the schools because they will be built on land leased rather than owned by the District. We disagree. See Harris v. Keehn, 25 N.M. 447, 451, 184 P. 527, 529 (1919), where the court said:
"[A] tenant in possession has the right to such possession against the world during the continuance of his lease and may maintain an action for damages for the disturbance or deprivation of such possession. * * *"
See also White v. Board of Education of Silver City, 42 N.M. 94, 75 P.2d 712 (1938).
In addition, the District offered into evidence four other leases between the District and the Navajo tribe for Reservation lands, on which schools are presently located. Unlike the situation here, those schools were built primarily with federal funds rather than bond proceeds. After reviewing these leases, as well as the other evidence introduced concerning them, the trial court found that the Board of Education "as an agent of the State of New Mexico has such exclusive control of the school system throughout the District as required by the Constitution and Laws of the State of New Mexico." In our opinion, that finding of fact was amply supported by the evidence introduced at the trial.
The United States Supreme Court summarized its various decisions concerning *1183 the states' power and jurisdiction on Indian reservations in the following way:
"The upshot has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law. * * *"
Mescalero Apache Tribe v. Jones, supra. We fail to see how Navajo tribal self-government, or the rights granted or reserved by federal law would be in conflict with the state's operation and exclusive control of the schools located on Reservation lands leased by the District with the approval of both the Navajo tribe and the Secretary of the Interior.
In fact, our impression is that it has long been the policy of the federal government to encourage and support the states in providing public education to Indian children, whether they live on or off a reservation. By 25 U.S.C. § 231 (1970), Congress authorized the Secretary of the Interior to permit the states "to enforce the penalties of State compulsory school attendance laws against Indian children, and parents, * * *." The tribe must, however, first adopt a resolution consenting to such enforcement.
In this connection we quote from 10 Navajo Tribal Code, § 103 (1969), as follows:
"The Tribal Council consents to the application of state compulsory school attendance laws to the Indians of the Navajo Tribe and their enforcement on Indian lands of the Navajo Indian Reservation wherever an established public school district lies or extends within such Reservation."
Through the years, Congress has also provided substantial financial assistance to state and local educational agencies for the purpose of educating Indians, such as: Impact Aid funds, granted pursuant to 20 U.S.C. §§ 236-40 (1970), to compensate the local agency for the tax loss it suffers due to the non-taxable Indian lands in the district; Johnson-O'Malley funds, granted pursuant to 25 U.S.C. § 452 (1970), to be expended for the education (and other needs) of Indians in the state; Title I (of the Elementary and Secondary Education Act) funds, granted pursuant to 20 U.S.C. § 241a et seq. (1970), to assist local educational agencies serving areas with concentrations of children from low-income families; "Public Law 815" funds, granted pursuant to 20 U.S.C. § 644 (1970), to assist those local educational agencies which suffer "impairment in financing abilities created by immunity from taxation of Indian lands," in the cost of constructing schools; and Emergency School Aid Act funds, granted pursuant to 20 U.S.C. §§ 1601-19 (Supp. II, III 1973), to provide financial assistance to local educational agencies to eliminate or prevent minority group (specifically including Indians) isolation and to improve the quality of education for all children.
In accordance with these programs, school districts in New Mexico containing concentration of Reservation and non-Reservation Indians have applied for and received millions of dollars of assistance in providing public education to Indian children. See Natonabah v. Board of Ed. of Gallup-McKinley Cty. Sch. D., 355 F. Supp. 716 (D.N.M. 1973); NAACP Legal Defense & Education Fund, An Even Chance (Jan. 1971).
A further indication of the Congressional policy of encouraging New Mexico to provide public education to all of its citizens, including Indians, is that part of the state's enabling act which orders that "provision shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of said State and free from sectarian control, * * *." Act of June 20, 1910, ch. 310, § 2, 36 Stat. 557.
The New Mexico Constitution recites this promise in two separate places: N.M. Const. art. XII, § 1, and N.M.Const. art. XXI, § 4. Other states with similar constitutional *1184 provisions have concluded that Indian children are entitled to attend state public schools, even though Indian or federal schools might also be available in the same district. Jones v. Ellis, 8 Alaska 146 (1929); Piper v. Big Pine School Dist. of Inyo County, 193 Cal. 664, 226 P. 926 (1924); Grant v. Michaels, 94 Mont. 452, 23 P.2d 266 (1933); Crawford v. District School Board for School Dist. No. 7, 68 Or. 388, 137 P. 217 (1913).
We recognize that the federal government, in compliance with its treaty obligations to the Navajo Tribe, has a duty to provide for education and other services needed by Indians. See Warren Trad. Post Co. v. Arizona State Tax Com'n., 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). In the instant case, we need not decide whether the federal government or the State of New Mexico has the primary responsibility to provide education for the Navajo children. It is only necessary to acknowledge that under our state constitution we have some responsibility, without deciding that it is exclusively one belonging to our state.
In order to provide public schools for the Reservation children, the District has built and maintained schools on the Reservation for many years. In fact, approximately 4,100 of the 5,400 District students presently attend schools located on the Reservation. Were these children to be bused to schools located off the Reservation, as the appellants urge, some of them would be making a 150-mile round trip each day. As this court has previously stated:
"If the districts are made so large that school children are unable to make the trip to school and back home each day, then they would be denied a free school just as effectively as if no school existed."
Strawn v. Russell, 54 N.M. 221, 219 P.2d 292 (1950). Furthermore, were we to hold in favor of the appellants, the District would be required to make provisions off the Reservation for these 4,100 students who presently attend schools on the Reservation.
The Navajo Tribe has also supported State public education as shown in 10 Navajo Tribal Code (adopted 1969), which provides as follows:
"(a) No rent shall ever be charged or accepted for withdrawals, permits, or leases of tax exempt Tribal land used primarily for school or other legitimate educational purposes; provided, that Navajo children or adults be admitted without discrimination to schools or other educational activities conducted on such lands.
"(b) Such withdrawals, permits, or leases shall expressly provide that they are rent-free in consideration of the tax-exempt status of the Tribal land embraced within them and other Navajo Tribal land in the same state, and that rent on the land embraced must be paid at the reasonable appraised rental value, but at not less than $10 per acre annually, whenever any Tribal land in the same state as withdrawal, permit, or lease ceases to be tax exempt."
The judgment of the trial court will be affirmed.
It is so ordered.
STEPHENSON and MONTOYA, JJ., concur.